990 A.2d 549 (2010)
191 Md. App. 48
Keith Allen WASHINGTON
v.
STATE of Maryland.
Nos. 00663, 02470, September Term, 2008.
Court of Special Appeals of Maryland.
January 29, 2010.
Reconsideration Denied March 31, 2010.
*554 Michael P. Lytle (Warnken, LLC on the brief), Towson, for appellant.
Jessica V. Carter (Douglas F. Gansler, Atty. Gen. on the brief), Baltimore, for appellee.
Panel: DEBORAH S. EYLER, KEHOE, RODOWSKY, LAWRENCE F. (Retired, Specially Assigned) JJ.
KEHOE, J.
Following a nine day jury trial in the Circuit Court for Prince George's County, Keith Allen Washington ("appellant") was convicted of involuntary manslaughter, two counts of first degree assault, and two counts of the use of a handgun in the commission of a felony or crime of violence. Subsequently, the trial court denied appellant's motion for a new trial. Appellant appeals both his convictions and the denial of his motion for a new trial.[1]
Appellant presents ten issues to this Court, which we have consolidated, reworded and re-ordered as follows:
I. Did the trial court err in prohibiting appellant from introducing evidence of the State's only eyewitness's prior convictions for crimes of violence to demonstrate his allegedly violent propensities?
II. Did the trial court err in preventing appellant from cross-examining the State's only eyewitness about his failure to register as a sex offender in Maryland?
III. Did the trial court err in permitting the State to elicit a hearsay statement that appellant was "looking for a fight," as a present sense impression?
IV. Did the trial court err in failing to declare a mistrial when a State's witness testified that appellant was "hostile" on the telephone after the witness had been *555 specifically instructed not to make such a statement?
V. Did the trial court err in failing to sustain appellant's objection to the State's allegedly improper remark made in its opening statement?
VI. Did the trial court err in failing to declare a mistrial based upon the State's allegedly improper remarks made in its closing argument?
VII. Did the trial court err in denying appellant's motion for a new trial?
The first issue is not preserved for appellate review. We answer the remaining questions in the negative and affirm the convictions.

Background
Appellant, who was, at that time, a Prince George's County police officer, and his wife, Stacey Washington ("Mrs. Washington"), purchased a bed from Marlo Furniture which was delivered to their Accokeek, Maryland residence in December, 2006. The bed rails, however, were defective and either appellant or Mrs. Washington requested replacements. Marlo agreed to do so and arrangements were made to deliver the new bed rails on January 24, 2007, between 2:30 and 5:30 p.m. Appellant took off from work to be at home when the delivery arrived. When the bed rails were not delivered during the specified time frame, appellant called Marlo to inquire about the delivery. After several phone calls, appellant was notified that the rails would be arriving around 7:30 p.m. At about that time, Brandon Clark ("Clark") and Robert White ("White"), two furniture deliverymen, arrived at the Washington residence with the bed rails. Appellant met Clark at the door. Unbeknownst to Clark or White, appellant had a handgun tucked into his waistband. White and Clark, accompanied by appellant, carried the bed rails to the master bedroom on the second floor. They were alone; Mrs. Washington and the Washington's six year old daughter were having dinner in the first floor kitchen. A few minutes later, appellant shot both Clark and White. White was severely injured and Clark died nine days later from complications related to his wounds.
After an investigation by the Prince George's County Police Department, a grand jury sitting in the Circuit Court for Prince George's County indicted appellant on twelve counts:
Count I second degree felony murder (Brandon Clark);
Count II second degree specific intent to kill murder (Brandon Clark);
Count III second degree specific intent to do serious bodily harm murder (Brandon Clark);
Count IV second degree depraved heart murder (Brandon Clark)
Count V voluntary manslaughter (Brandon Clark);
Count VI involuntary manslaughter  grossly negligent act (Brandon Clark);
Count VII involuntary manslaughter  unlawful act (Brandon Clark);
Count VIII first degree assault (Brandon Clark);
Count IX use of a handgun in the commission of a felony or crime of violence (Brandon Clark);
Count X attempted second degree murder (Robert White);
Count XI first degree assault (Robert White);
Count XII use of a handgun in the commission of a felony or crime of violence (Robert White).
Prior to appellant's trial, White filed a civil action against appellant and Prince *556 George's County seeking $400,000,000 in damages arising out of the shooting.
Appellant's trial was preceded by in limine motions filed by both the State and appellant pertaining to evidentiary matters. Several of the trial court's rulings on these motions are pertinent to the issues raised on appeal and we will discuss them below.
While a detailed description of the evidence presented at trial is not necessary for this opinion, we will summarize the testimony of White, on the one hand, and appellant and Mrs. Washington, on the other, to illustrate the contrast in their versions of events.
According to the State, the shootings were unprovoked and unjustified. The State introduced evidence from an employee of Marlo who had spoken to appellant earlier in the day to the effect that appellant was angry and hostile over the telephone. White testified that, upon arriving at appellant's resident, Clark went up to the front door and talked to appellant, while White stayed in the delivery truck. White recounted that, when Clark came back to the truck to get the bed rails, he told White that appellant was "looking for a fight." White then testified as to his version of what then occurred:
[THE WITNESS]: When we went inside, he direct [sic] us to a bedroom upstairs. I was walking first, in front of Brandon. Brandon was walking behind me. He was behind Brandon, and he directed us to a bedroom upstairs. We went in, we set the rails down, and then Mr. Washington started arguing with Brandon.
[THE STATE]: And what was Mr. Washington arguing with Brandon about?
[THE WITNESS]: Because, I guess, we got to his house late, and he was upset because he was waiting to his house all day.
[THE STATE]: Go ahead and tell us what happened.
[THE WITNESS]: So Brandon kneeled down  I'm standing on the other side, close to the railing, Brandon at the bed, and he ask Mr. Washington why you disassemble your bed, and he said  this was his words  "Motherfucker, are you telling me what to do in my house?" I said, "Brandon, do you know Mr. Washington?" Brandon said no.
So it was a few seconds later he pushed Brandon and told Brandon to get the fuck out of his house. I said, "Brandon, I think we should go." Brandon said, "No, just let me do my job. It's only going to take ten minutes."
Brandon kneeling again  he's still kneeling. Mr. Washington pushed him again, "Get the fuck out of my house," and the third time he pushed him, he pushed him until he was actually laying on his side. Brandon jump up. I told Brandon, "That's it; we out of here." I stepped between both of them, Mr. Washington and Brandon, Brandon going back out the door with his hands up. I got my back to Mr. Washington, and all I heard was shots after we got out of the room. He said, "I know how to get you the fuck out my house."
[THE STATE]: After you heard the shots, what did you do; what did you see?
[THE WITNESS]: Brandon was going back towards the stairs, and I grabbed Brandon to keep him from falling down the stairs.
* * * * * *
I had to lay him down, and as I ask him where the cell phone at, when I turn around, I hear more shots. Then I realized *557 I was hit.... [i]n the chest and in the stomach.
* * * * * *
I didn't want to go down the stairs because he already shot me. So I moved up, to move away from Brandon,... and I laid down here [pointing to a diagram], down on this side. Mr. Washington went back in his room. I got back up because I knew I needed help. When I got back up, he comes out of his room and he said, "Motherfucker, didn't I told you to stay down," and he starts shooting again. That's when I realized I was hit in the knee. I went down.
[THE STATE]: You went down. Then what happened?
[THE WITNESS]: We laid there screaming, asking him to help us, to call somebody, and he said he wasn't calling nobody.
In contrast, appellant and Mrs. Washington testified that appellant had acted in self-defense. Appellant testified that when Clark and White arrived at appellant's home he instructed them to put the bed rails in the foyer, but they carried them to the master bedroom instead. Appellant led Clark and White to the master bedroom, but when he got there, he noticed that White was no longer following. When appellant asked Clark about White's whereabouts, Clark "backslapped" appellant twice in the chest and told him "I got him, Shorty."[2] Appellant then saw White coming out of appellant's daughter's bedroom. When appellant told White to get out of his daughter's bedroom, Clark again responded with "I told you, Shorty, I got him." Appellant told Clark and White to leave his house. After appellant told Clark and White for the third time to leave his house, Clark responded that appellant needed to watch how he talked to people. Appellant again demanded that Clark and White leave. He testified:
[APPELLANT]: Mr. White punched me on the side of the face.
[DEFENSE COUNSEL]: What did Mr. Clark do?
[APPELLANT]: When he punched me, Mr. Clark punched me in the back of the head.
[DEFENSE COUNSEL]: What did you do after Mr. White punched you and Mr. Clark punched you in the back of the head?
[APPELLANT]: When he punched me, I swung around with my hand, and I just covered up because I couldn't stop them. They were on me.
[DEFENSE COUNSEL]: What position was your body in when you said you tried to cover up?
[APPELLANT]: I was like this, covering up my head and my face and I was 
[DEFENSE COUNSEL]: At this time, Your Honor, I'd ask Mr. Washington to step down.
[THE COURT]: Okay.
(Witness steps down from witness stand.)
[DEFENSE COUNSEL]: You can stand in front of the jury. Now, Mr. Washington, you said you attempted to cover up, and you described the position of your body. Can you let the ladies and the gentlemen of the jury know, after Mr. Clark and Mr. White hit you, what you did physically?
[APPELLANT]: Yeah. I swung around, with my hand like that, and they were on me and they was  I was covering up, *558 like this, trying to protect my head and my face.
[DEFENSE COUNSEL]: And at that point, where is Mr. Clark and Mr. White?
[APPELLANT]: Mr. Clark is right here to my left, and Mr. White is right here to my right.
[DEFENSE COUNSEL]: And what are they doing at that point?
[APPELLANT]: They were hitting me and kicking me.
Appellant went on to testify that he shot Clark and White in self-defense.
Mrs. Washington testified that she heard appellant, White and Clark going upstairs with the bed rails. She continued:
I didn't hear anything for a little while, and then I heard my husband say, "Get out of my house; leave my house; get out now," and that's the next thing I heard.
[DEFENSE COUNSEL]: And once you heard your husband say those words, what did you do?
[MRS. WASHINGTON]: I got up. I told [K.] [appellant's and Mrs. Washington's six year old daughter]  I told [K.] to stay put, to don't move, and that's when I got up. And I got up to go see what was wrong, because I could tell something was wrong.
* * * * * *
[DEFENSE COUNSEL]: Okay Ms. Washington. You stated that you were walking from the kitchen as you were peering up the stairs. What did you see when you looked upstairs?
[MRS. WASHINGTON]: That's when I saw Keith bent over, and these two men were on either side of him and they were beating him.
[DEFENSE COUNSEL]: And when you looked up and saw that, what did you do? And you can take your time, Mrs. Washington.
[MRS. WASHINGTON]: I was walking into the hallway and, as I was coming around through the hallway, I looked up and then I could see them, him in the middle, and he was kind of bent over, and then there was one man on either side of him, and they were beating him. And I thought oh, my god; oh, my god; they're just going to beat him to death, because he was just kind of bent over and he couldn't do anything. And I thought, okay, I need to help him; I need to help him. And so I was going to start up the steps. And as I was getting ready to start up the steps, I was thinking what if something happens to me, what is [K.] going to do? I didn't want her to come in here  (crying).
* * * * * *
[DEFENSE COUNSEL]: Ms. Washington, I think where we were, you were about to describe  I'll just ask you the question.
As you looked upstairs, as you're leaving the kitchen, where were the deliverymen positioned with respect to where your husband, Keith Washington, was?
[MRS. WASHINGTON]: He was bent over, and there was one man on either side of him.
[DEFENSE COUNSEL]: I believe you said that you were at the bottom of the stairs. At that point, when you looked upstairs and you were at the bottom of the stairs, what did you say or do?
[MRS. WASHINGTON]: The first thing I thought was, my god; oh, my god, I need to help him.
* * * * * *
[MRS. WASHINGTON]: As I started to go up the steps, that's when I knew I *559 couldn't help him. And then I was going to call 911. (Crying.)
After the shootings, Mrs. Washington called 911. Appellant joined in the call. The State played a recording of the call to the jury. The State introduced forensic evidence regarding the gunshots. The evidence could support the conclusion that at least one of the gunshots was fired from a distance of four feet or more, while the other gunshots were at closer range. A DNA analysis of appellant's handgun indicated that both appellant's and White's DNA was present on it. The State also presented the testimony of an emergency room physician who treated appellant on the night of the shooting. She did not observe any trauma to appellant's neck or face. She also testified that the X-rays taken of appellant were negative, indicating no fractures. The emergency room nurse who examined appellant that night gave similar testimony. To further corroborate the physician's testimony, the State also introduced a photograph of appellant taken before he was transported to the hospital, which did not reveal any indication of significant injury.
Appellant called other witnesses who had been present at the Washington residence after the shootings. They testified that appellant's face appeared puffy or swollen on the night of the shooting and that appellant was holding an ice pack to his face before being transported to the hospital. The appellant called a forensic pathologist who testified that, in his opinion, White's testimony was not consistent with evidence regarding his injuries and Clark's autopsy.
On February 13, 2008, the jury convicted appellant of involuntary manslaughter  unlawful act (Brandon Clark), two counts of first degree assault (Brandon Clark and Robert White), two counts of use of a handgun in commission of a felony or crime of violence (Brandon Clark and Robert White), and attempted second degree murder (Robert White), and acquitted him of all remaining counts. Appellant was sentenced on May 27, 2008, to a total of 45 years incarceration.[3] Appellant filed a timely notice of appeal from those convictions on May 30, 2008.
On August 25, 2008, appellant filed a motion for a new trial, which was denied on November 21, 2008. Appellant filed a timely notice appealing that judgment on December 2, 2008.
Additional facts will be discussed as necessary in this opinion.

I.

Did the Trial Court Err in Prohibiting Appellant from Introducing Evidence of White's Prior Convictions to Demonstrate His Allegedly Violent Propensities?
Before this Court, appellant contends:

*560 Prior to trial, counsel for [appellant] discovered that White, the State's only eyewitness, had 11 prior convictions and received at least one significant period of incarceration (a fact that helped explain why the witness had no convictions between 1995 and 2005). In support of his self-defense theory at trial, Mr. Washington sought to introduce White's prior convictions to attack White's credibility and to show bias, and because the probative value of his convictions far outweighed any prejudicial effect.
* * * * * *
In response, Mr. Washington argued that, given the nature of Mr. White's prior convictions, the convictions were highly relevant to White's credibility. The defense asserted multiple theories of admissibility, specifically claiming that the convictions were admissible under (1) the United States Constitution, (2) Md. Decl. of Rights art. 21, and (3) Md. Rule 5-609. Moreover, White's convictions were evidence of bias....
The trial court committed reversible error. Because White's convictions for aiming a firearm, assault and battery, assault with intent to commit a sexual offense, and domestic violence are relevant to the issue of first aggressor status, their exclusion was improper....
Asserting that White's status as the initial aggressor was an "essential element" to his claim of self-defense, and relying on Hemingway v. State, 76 Md.App. 127, 543 A.2d 879 (1988)[4], and Md.Code Ann., Cts. & Jud. Proc. § 9-115, appellant contends that he was entitled to introduce White's prior convictions to prove White's violent nature. Such evidence, appellant argues, would be relevant to appellant's assertion that White and Clark were the first aggressors. Appellant's argument was not presented to the trial court and, as such, is not subject to review by this Court in this proceeding. We will explain.

A. Preservation.
At the time of trial, White had the following criminal record:

Date of Conviction: Jurisdiction: Conviction:
7/10/89 Virginia Unlawful Entry
7/10/89 Virginia Larceny
6/7/91 South Carolina Receiving Stolen Goods
6/7/91 South Carolina Attempted 3rd Degree Burglary
8/3/93 South Carolina Grand Larceny
6/16/94 South Carolina Pointing a Firearm
4/27/95 South Carolina Receiving Stolen Goods
6/14/95 South Carolina Assault and Battery
12/13/95 South Carolina First Degree Burglary
12/13/95 South Carolina Assault with Intent to Commit Sexual
 Conduct
1/27/05 South Carolina Domestic Violence

*561 The State filed a motion in limine requesting that the trial court "order that the defense not be permitted to impeach the testimony of [White] by introducing evidence of the 1989 unlawful entry and larceny convictions; the 1991 attempted third degree burglary and receiving stolen goods convictions; the 1994 pointing a firearm conviction; the 1995 convictions for assault and battery, first degree burglary and assault with intent to commit sexual conduct; and the 2005 domestic violence conviction." In its motion, the State contended: (1) that the 1991 and 1994 convictions were more than 15 years old and were thus not admissible for impeachment purposes pursuant to Maryland Rule 5-609(b); (2) the convictions for pointing a firearm, assault and battery, first degree burglary and domestic violence were inadmissible for impeachment purposes because violent crimes have "`little, if any, bearing on honesty and veracity'" and (3) the assault with intent to commit sexual conduct was "in the same vein with the crimes of violence mentioned previously and should likewise be inadmissible for impeachment purposes."
Appellant's response to the State's motion in limine asserted that White's convictions were admissible to impeach White's credibility and to show White's bias. Appellant did not assert that he was also seeking admission of White's convictions to prove White's allegedly violent nature or that White was the first aggressor.[5]
On January 14, 2008, the trial court, after conducting a hearing and receiving memoranda of law for both sides, issued an order excluding all of White's convictions other than those for grand larceny, receiving stolen goods, and first degree burglary as relevant to White's credibility.
Maryland Rule 8-131(c) provides in pertinent part that "[o]rdinarily, the appellate court will not decide any ... issue [other than jurisdiction] unless it plainly appears by the record to have been raised in or decided by the trial court...." In Evans v. State, 174 Md.App. 549, 557, 922 A.2d 620, cert. denied, 400 Md. 648, 929 A.2d 890 (2007), we explained:
Maryland appellate courts have consistently held that they will not review issues not raised or decided at the trial level. See Taylor v. State, 381 Md. 602, 612, 851 A.2d 551 (2004) (citing Md. Rule 8-131(a) in holding that a claim of double *562 jeopardy was not preserved because it was not raised at the trial level); Conyers v. State, 354 Md. 132, 148, 729 A.2d 910, (1999) (citing Md. Rule 8-131(a) in holding that several issues in review of a death sentence were not preserved because they were not raised at the trial level).... We have specifically held that the failure to argue a specific theory in support of a motion to suppress evidence constitutes waiver of that argument on appeal. Johnson v. State, 138 Md.App. 539, 560, 772 A.2d 1260 (2001) (citing Reynolds v. State, 327 Md. 494, 502-03, 610 A.2d 782 (1992); Brashear v. State, 90 Md.App. 709, 720, 603 A.2d 901 (1992)).
In Univ. Sys. of Md. v. Mooney, the Court of Appeals explained:
[t]he purpose of [Rule 8-131(a)] is to require counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings and to prevent the trial of cases in a piecemeal fashion, thus accelerating the termination of litigation.
407 Md. 390, 401, 966 A.2d 418 (2009) (citations and quotations omitted).
Since appellant failed to raise the issue of the admissibility of White's convictions as evidence of his allegedly violent character to the trial court, we will not consider the issue on appeal.

B. Competency of Trial Counsel.
As an alternate ground for appellate relief, appellant argues that his trial counsel provided ineffective assistance of counsel by failing to preserve the issue for appellate review. Conceding that "claims of ineffective assistance of counsel are usually limited to post conviction proceedings" as opposed to direct appeals, appellant argues that this Court should consider the ineffective assistance of counsel issue. Appellant states:
The record in this case makes clear the following: (1) trial counsel strenuously argued for the admission of White's criminal convictions; and (2) there is a mountain of case law on admissibility of such convictions in the self-defense context. From that vantage point, it is clear that, if the argument was not preserved for appeal, (1) it was not a strategy of trial counsel to not argue what was perhaps the most likely route to the admissibility of the convictions, and (2) trial counsel committed a serious error in not making the argument.
In order to prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Courts employ two presumptions, first, that trial counsel was competent, and, second, that "the challenged action might, under the circumstances, be considered sound trial strategy." Oken v. State, 343 Md. 256, 283, 681 A.2d 30 (1996). Generally, the appropriate avenue for the resolution of a claim of ineffective assistance of counsel is a post-conviction proceeding:
By having counsel testify and describe his or her reasons for acting or failing to act in the manner complained of, the post conviction court is better able to determine intelligently whether the attorney's actions met the applicable standard of competence. Where, as here, the record sheds no light on why counsel acted as he did, direct review by this Court would primarily involve "the perilous process of second-guessing," *563 perhaps resulting in an unnecessary reversal in a case where sound but unapparent reasons existed for counsel's actions. Consequently, we leave consideration of [the defendant's] ineffective representation claim to the circuit court upon post conviction proceeding where there can be a studied evaluation of a proper record should appellant choose to pursue the matter.[]
Johnson v. State, 292 Md. 405, 435, 439 A.2d 542 (1982), abrogated in part on other grounds, Hoey v. State, 311 Md. 473, 495, 536 A.2d 622 (1988) (citation and footnote omitted).
Review of an ineffective assistance of counsel claim on direct appeal is only appropriate if the ineffectiveness is revealed to be "blatant and egregious" by the record alone. Mosley v. State, 378 Md. 548, 563, 836 A.2d 678 (2003). The Court of Appeals provided examples of such error in Smith v. State, 394 Md. 184, 200, 905 A.2d 315 (2006), and In re Parris W., 363 Md. 717, 726, 770 A.2d 202 (2001).
In In re Parris W., the juvenile's counsel mistakenly subpoenaed witnesses for the wrong trial date. 363 Md. at 727, 770 A.2d 202. The attorney admitted to the error, id., and there was no question as to his motivation. There was no suggestion that trial tactics, or anything other than a simple mistake, lay behind trial counsel's action. Since the attorney admitted his mistake to the trial court, there was no need for the Court of Appeals to exercise the deference traditionally given to trial counsel with regard to tactical decisions. Id.
In Smith, the trial transcript clearly established that trial counsel disclosed privileged attorney-client communications to the trial court. 394 Md. at 192, 905 A.2d 315. The Court of Appeals stated that since "we can conceive of no circumstances that would require Smith's counsel to reveal the substance of his advice to the court.... [W]e conclude that a collateral evidentiary hearing concerning Smith's counsel's disclosure would be superfluous." Id. at 201, 905 A.2d 315.
The case before us is different. Unlike Parris W., there was no admission of error by trial counsel; in contrast to Smith, there was no clear and unambiguous breach of a lawyer's responsibility to a client. In the instant case, appellant's appellate counsel have identified a trial strategy that they believe should have been pursued at trial. The failure to do so may have been a matter of lawyerly dereliction or may have reflected a tactical consideration by trial counsel. Upon the record presented to us, we can only speculate. Under these circumstances, the appropriate avenue for the resolution of the claim of ineffective assistance of counsel is a post-conviction proceeding. Johnson v. State, 292 Md. at 435, 439 A.2d 542.

II.

Did the Trial Court Err in Preventing Appellant from Cross-Examining White about White's Failure to Register as a Sex Offender in Maryland?
In 1995, White was convicted in South Carolina of assault with intent to commit sexual conduct. As such, he was required to register as a sexual offender with the Secretary of the Maryland Department of Public Safety and Correctional Services within fourteen days of commencing employment in Maryland. See MD.CODE ANN. CRIM. PROC. § 11-705(b)(3)(i) (2008). White had been delivering furniture in Maryland for approximately three weeks prior to the events at appellant's residence and had not registered as a sexual offender in Maryland at that time.
*564 Prior to trial, appellant filed a motion in limine requesting permission to cross-examine White as to his failure to register. Appellant advanced four bases for admissibility regarding White's failure to register: (1) to expose a motive to lie and/or bias in light of circumstantial evidence that White expected a "deal" from the State regarding his failure to register in exchange for his testimony against appellant; (2) to expose a motive to lie and/or bias in light of his pending civil action against appellant and Prince George's County because a conviction would virtually guarantee a "win" for White in his civil action; (3) as a prior act that is probative of untruthfulness, pursuant to Md. Rule 5-608(b); and (4) to impeach White's credibility in light of his sex offender status because the jury may have disbelieved White's testimony if it was aware that White was a convicted sex offender, and according to appellant, was found in appellant's daughter's bedroom. The trial court held a hearing on the motion.
At the hearing, the State represented, without contradiction, that no offer had been made to White regarding his failure to register as a sex offender. The State also called White as a witness. On direct examination, he testified that he was aware that he could be charged for failing to register, that the Prince George's County State's Attorney's office would determine whether he was to be charged, and that a favorable assessment of his criminal trial testimony by the State's Attorney's office might affect its decision whether to charge him. On cross-examination, the following exchange took place:
[DEFENSE COUNSEL]: Mr. White, it is your expectation that if the State views your testimony, in a trial against Mr. Washington, favorably, that they will consider that in the decisions they make about whether or not to charge you with failing to register in the State of Maryland as a sex offender, correct?
[THE WITNESS]: I don't know.
* * * * * *
[DEFENSE COUNSEL]: It is your expectation, Mr. White, that if the State views your testimony at Mr. Washington's trial as favorable, that they might consider that when making decisions, if you were prosecuted, about what kind of plea offer you might receive.
[THE WITNESS]: I don't know.
* * * * * *
[DEFENSE COUNSEL]: What are you saying you expect?
[THE WITNESS]: I don't know what they going to do.
[DEFENSE COUNSEL]: My question to you is not what you know about what they're going to do, but what your expectation is.
The question is, is it your expectation that if the State views your testimony in the trial of Mr. Washington favorably, that they would consider that in deciding whether or not you'll get prosecuted for failing to register as a sex offender?
[THE WITNESS]: I don't know.
[DEFENSE COUNSEL]: You don't know what your expectation is?
[WITNESS]: No.
At the conclusion of the hearing, the trial court stated:
[THE COURT]: Okay. The exact nature of your motion in this instance was a motion in limine ... for permission to elicit, on cross-examination, Robert White's failure to register as a sex offender in Maryland, that it be admissible as a motive to falsify testimony in order to curry favor with the State.
I've read the Ware [v. State, 348 Md. 19, 67, 702 A.2d 699 (1997)] case. I've *565 read the Ebb [v. State, 341 Md. 578, 587, 671 A.2d 974 (1996)] case. I've gone over other cases, as well, on this specific issue, and believe that, in this instance, the Ebb case is dispositive.
My understanding of Mr. White's testimony and the proffer made by the State at the bench, which was accepted by the defense, was that no offer whatsoever was made by the State to Mr. White in the instance of his failure to register as a sex offender in the State of Maryland.
I heard Mr. White's testimony, and what he did say was he did not know what the [S]tate's [A]ttorney's office was planning and that he had not thought about it, didn't know what to expect. To me, that is fairly clear that he was saying that, again, no offer was made to him by the State, and he had no expectation of what to think was going to happen or any expectation of leniency on behalf of anything that he did testify or otherwise in this case.
Secondarily, if you look in evaluating the probative value versus the prejudicial value of your ability to do that in front of a jury, I believe any probative value of that, in terms of what he said as to expectation, is far outweighed by the prejudicial impact that it would have on a jury.
I've made another ruling about the offense for which he was convicted and for which he did not register in Maryland, and I weighed that similarly; that in the State of Maryland, based on my understanding of the current state of the law, I did not believe that offense was relevant to the issue of credibility, and I cited the cases and my reasons to do so and, in fact, that the probative value of such a conviction, when weighing all of the elements of it versus the prejudicial impact that it would have on the jury, was similarly situated.
And this, my compliments to you on your legal acumen and your four-pronged attack on the purpose of the sexual registration, but I feel that it falls short in this instance and am going to deny your motion and not permit you that cross-examination in this aspect in front of the jury.
On appeal, appellant advances only two of the grounds asserted at the trial court level: first, appellant argues that he should have been permitted to cross-examine White to show bias or a motive to lie in exchange for favorable treatment from the State; and second, evidence of White's failure to register was admissible under Rule 5-608(b) as a prior act probative of truthfulness. We will discuss each ground separately.

A. Bias or Motive to Testify Falsely.
Maryland Rule 5-616(a)(4) permits witnesses to be impeached by proof that "a witness is biased, prejudiced, interested in the outcome of the proceeding, or has a motive to testify falsely." The rule is a reflection of one aspect of the guarantee contained in both the Sixth Amendment and Article 21 of the Maryland Declaration of Rights of a defendant's right in a criminal case to confront the witnesses against him. Ebb v. State, 341 Md. 578, 587, 671 A.2d 974 (1996); Smallwood v. State, 320 Md. 300, 306-08, 577 A.2d 356 (1990). See also Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). However, trial courts retain
"wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation *566 that is repetitive or only marginally relevant."
Ebb, 341 Md. at 587, 671 A.2d 974 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) and citing Smallwood v. State, 320 Md. 300, 307, 577 A.2d 356 (1990)). Decisions of the Court of Appeals have established that, where the charge of bias stems from the pendency of criminal charges against a witness, courts should hold an evidentiary hearing outside the presence of the jury to permit the parties to address factors pertaining to the issue whether the probative value of the evidence outweighs the danger of unfair prejudice. Ebb, 341 Md. at 591, 671 A.2d 974; Jackson v. State, 340 Md. 705, 717, 668 A.2d 8 (1996); Watkins v. State, 328 Md. 95, 99, 613 A.2d 379 (1992).
As we have discussed, the trial court conducted such a hearing and determined that no offer had been made by the State to White, and that White had neither an expectation as to what the State might do regarding charges against him, nor an expectation of leniency in return for his testimony. The trial court determined that danger of prejudice generated by permitting appellant to cross-examine White regarding the failure to register as a sex offender outweighed its probative value.
Appellant argues that the trial court erred in relying on Ebb. In that case, the Court of Appeals considered whether the trial court abused its discretion in precluding the cross-examination of Timmons and Allen, two prosecution witnesses, with regard to criminal charges pending against them. 341 Md. at 586, 671 A.2d 974. In holding that there was no error, the Court explained:
As a general rule, pending criminal charges are not admissible to impeach a witness. An exception to that rule, however, is when the pending charges are offered to show bias, prejudice or motive of the witness in testifying. In determining whether to admit the evidence, the judge must engage in a balancing test giving wide latitude to cross-examine for bias or prejudice but not permitting the questioning "to stray into collateral matters which would obscure the trial issues and lead to the factfinder's confusion." The trial judge is in the best position to balance the probative value of the unrelated pending charges against the prejudicial effect and to decide when their admission would enmesh the trial in confusing or collateral issues.
* * * * * *
On voir dire, Timmons and Allen testified that the State had not offered and that they did not expect leniency in exchange for their testimony. They denied any expectation of leniency in return for their testimony and there was no basis for any expectation of leniency....
* * * * * *
In determining the admissibility of the evidence, the trial judge considered the testimony of the witnesses, i.e., that they were not offered and did not expect leniency. He made a preliminary finding that based on the denial of the witnesses and the uncontroverted representation of the prosecutor that there was no offer of leniency, there was a complete lack of probative value or that the value for impeachment was so slight as to be overcome by the probability that the testimony would be unduly prejudicial or confusing to the jury. This we believe, is a proper matter for the trial court's discretion.
Id. 341 Md. at 588-591, 671 A.2d 974 (citations omitted).
*567 Appellant attempts to distinguish Ebb on the basis that the witnesses in that case affirmatively denied expecting anything in return for their testimony, 341 Md. at 583, 671 A.2d 974, whereas White "equivocated multiple times.... Such ... hesitant response[s] could not possibly dismiss any fear of White's bias and/or motive to lie. In light of White's dubious response, the trial court erred in preventing [appellant] from cross-examining White on this matter in the presence of the jury." Appellant's argument is not persuasive.
White's testimony established, to the satisfaction of the trial court, that the State had made no offer to White and, in the words of the trial court, that White had "no expectation of what to think was going to happen or any expectation of leniency...." Certainly implicit in the trial court's finding was an assessment of the credibility of White's testimony on the issue. Where, as in an in limine hearing, no jury is involved, we will not set aside a trial court's factual finding unless it is clearly erroneous and we give due regard to the trial court's ability to assess the credibility of witnesses. Maryland Rule 8-131(c). As Judge Moylan explained for this Court in Morris v. State, 153 Md.App. 480, 837 A.2d 248 (2003):
The most basic rule of appellate review of fact-finding is that of extending great deference to the fact finder, be it judge or jury. Appellate judges do not see or hear the witnesses or have the benefit of any sort of non-verbal communication. They are relatively far less able to assess credibility than are the fact finders on the scene. Appellate judges, moreover, are not immersed in the local context and do not get the sometimes inexpressible "feel" of the case. They are relatively far less able to weigh the evidence than are the fact finders on the scene. The basic rule of fact-finding review, therefore, is that the appellate court will defer to the fact-findings of trial judge or jury whenever there is some competent evidence which, if believed and given maximum weight, could support such findings of fact. That is the prime directive.
Id. at 489, 837 A.2d 248.
We will not disturb the trial court's finding that White had no expectation of leniency arising out of his testimony. We conclude that the trial court did not abuse its discretion in determining that the prejudicial effect of evidence regarding White's failure to register as a sex offender outweighed any possible probative value. Ebb, 341 Md. at 588, 671 A.2d 974.

B. An Act "Probative of Truthfulness."
Appellant also contends that evidence of White's failure to register was admissible under Rule 5-608(b) as a prior act probative of truthfulness, or, rather, the lack thereof. Rule 5-608(b) provides:
(b) Impeachment by examination regarding witness's own prior conduct not resulting in convictions. The court may permit any witness to be examined regarding the witness's own prior conduct that did not result in a conviction but that the court finds probative of a character trait of untruthfulness. Upon objection, however, the court may permit the inquiry only if the questioner, outside the hearing of the jury, establishes a reasonable factual basis for asserting that the conduct of the witness occurred. The conduct may not be proved by extrinsic evidence.
Appellant contends that "White's failure to register as a sex offender was an act of deception and, as such, is an act that is probative of untruthfulness." He suggests that, since it was uncontroverted that White was required to register as a sex offender and had not done so, a "reasonable *568 factual basis" exists for an inquiry. Appellant also asserts that, if White had been convicted of failure to register as a sex offender, the conviction would likely have been admissible, pursuant to Md. Rule 5-609, as a crime relevant to witness credibility because a failure to register necessarily involves an act of deception.
The crux of appellant's argument is that White's failure to register was effectively a series of misrepresentations to the State of Maryland and that act (or acts) of deception is probative of untruthfulness. Appellant seeks support in Maryland case law interpreting Rule 5-609, which pertains to the admissibility of evidence of prior crimes for impeachment purposes.[6] Appellant argues that in Ricketts v. State, 291 Md. 701, 713, 436 A.2d 906 (1981), the Court of Appeals held that the name of an impeachable offense, in the words of appellant, "must immediately communicate to the jury the past act the witness committed and must obviously and directly bear on the witness' credibility." Appellant continues that, if White had been convicted of failing to register, the conviction would "most likely have been admissible, pursuant to Md. Rule 5-609" for impeachment purposes. Finally, appellant contends that the trial court erred in determining that the prejudicial effect of the evidence outweighed its probative value.
For its part, the State argues that White's failure to register as a sex offender is not probative of truthfulness because "there may be any number of reasons for a person's failure to register" and White, at the in limine hearing, did not testify as to why he had not registered out of a concern regarding his privilege against self-incrimination.[7]
*569 Both sides point to cases from other jurisdictions to support their contentions. The State cites United States v. Montgomery, 390 F.3d 1013, 1016 (7th Cir.2004), State v. Young, 378 S.C. 101, 661 S.E.2d 387, 388 (2008), and People v. Barner, 374 Ill.App.3d 963, 313 Ill.Dec. 122, 871 N.E.2d 849 (2007), for the proposition that failure to register as a sex offender is not a crime reflecting upon a witness' credibility. We approach these cases with some degree of reservation.
All three courts were applying Federal Rule of Evidence 609(a),[8] or substantively similar state rules. Fed.R.Evid. 609, and its state law equivalents, allows all convictions, regardless of their nature, having a maximum penalty of more than one year's imprisonment, to be used to impeach a witness. If the witness is not a criminal defendant, the court utilizes a balancing test functionally equivalent to that set out in Maryland Rule 5-609(a)(2). If the witness is a criminal defendant, the balancing test focuses exclusively upon prejudicial effect to the defendant. See 6 L. McLain MARYLAND LAW OF EVIDENCE § 609.6 at 538.
In contrast, under Maryland Rule 5-609(a), the "universe of convictions," State v. Giddens, 335 Md. 205, 213, 642 A.2d 870 (1994), that can be used to impeach a witness's credibility, is limited to "infamous crimes" (common law felonies and the common law crimen falsi) and crimes that are relevant to the witness' credibility. State v. Westpoint, 404 Md. 455, 478, 947 A.2d 519 (2008); Jackson v. State, 340 Md. 705, 712-13, 668 A.2d 8 (1995). In order to fall into the second category:
the crime itself, by its elements, must clearly identify the prior conduct of the witness that tends to show that he is unworthy of belief. Moreover, a crime tends to show that the offender is unworthy of belief, if the perpetrator "lives a life of secrecy" and engages in "dissembling in the course of [the crime], being prepared to say whatever is required by the demands of the moment, whether the truth or a lie."
Westpoint, 404 Md. at 484, 947 A.2d 519 (internal citations omitted) (quoting Giddens, 335 Md. 205, 642 A.2d 870).
With this distinction in mind, we turn to the specific cases cited by the State. Young did not address the admissibility of a conviction for failure to register; the court simply noted in passing that the trial court excluded evidence of a conviction for failure to register, "finding that it was not *570 a crime of dishonesty under [South Carolina Rule of Evidence] 609(a)(2), and that although the crime was punishable by imprisonment in excess of one year, the prejudicial effect of the conviction outweighed its probative value...." Young, 661 S.E.2d at 388 n. 1.
In Montgomery, the defendant had six prior felony convictions including one for unlawful failure to register as a sex offender. 390 F.3d at 1016. The District Court found that, with the exception of an obstruction of justice conviction, none of the convictions went to the defendant's truthfulness but admitted all six for impeachment purposes nonetheless. On appeal, the defendant argued that the District Court erred by doing so; in determining that the District Court did not abuse its discretion, the Circuit Court of Appeals did not single out the failure to register conviction for special analysis. Id. at 1016.
In Barner, the defendant was tried in 2004 on rape charges. 374 Ill.App.3d at 964, 313 Ill.Dec. 122, 871 N.E.2d 849. The trial court permitted him to be impeached with a 1999 conviction for failure to register as a sex offender. Id. at 968, 313 Ill.Dec. 122, 871 N.E.2d 849. On appeal, the issue was not whether the failure to register conviction was probative of the defendant's credibility but rather whether the trial court abused its discretion in admitting the conviction because, by so doing, it permitted the prosecution to bring to the jury's attention that the defendant had a prior sex crime conviction. Id. The appellate court determined that the trial court did not abuse its discretion, id. at 972, but, again, without discussing whether failure to register was relevant to the defendant's credibility.[9]
United States v. Easter, 66 F.3d 1018 (9th Cir.1995), is more instructive. In that case, the appellant argued that the District Court erred by not allowing the cross-examination of Oliver, a government witness, on the subject of his failure to register as a sex offender. The defendant argued that "Oliver's desire to avoid potential punishment for this failure could have furnished Oliver with a substantial motivation to testify for the [g]overnment." Id. at 1022. The Circuit Court of Appeals affirmed the conviction, holding that the District Court did not abuse its discretion in not permitting the cross-examination. Id.
First, the Circuit Court of Appeals noted that the District Court permitted cross-examination on other matters that impeached Oliver's credibility. Id. In addition, the Circuit Court of Appeals stated:
Trial judges have "wide latitude" in determining the proper scope of cross examination. Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); see also United States v. Lopez, 885 F.2d 1428, 1438 (9th Cir.1989) ("broad discretion"). Two factors the trial judge can consider are relevance and prejudice. Van Arsdall, 475 U.S. at 679, 106 S.Ct. 1431; Lopez, 885 F.2d at 1438. In the present case, the potential prejudice of describing a witness as a sex offender, who has not registered as such, is obvious. The countervailing relevance, if any, was minimal.
Id.
A common thread through these cases, and the Maryland cases as well, is that, even if impeachment evidence is otherwise *571 admissible, the trial court must also exercise its discretion to determine if the probative value of the evidence outweighs its prejudicial effect. See Maryland Rule 5-609(a); Westpoint, 404 Md. at 478, 947 A.2d 519; Giddens, 335 Md. at 214, 642 A.2d 870; Fulp v. State, 130 Md.App. 157, 168-69, 745 A.2d 438 (2000).
Turning to the case before us, White had not been charged, much less convicted, of failing to register. White had registered in both South Carolina and the District of Columbia, where he was residing at the time. He had been working in Maryland for only three weeks prior to the incident giving rise to the charges against appellant. The trial court had ruled that the underlying crime (assault with intent to commit sexual conduct) that required White to register was not itself relevant to credibility under Maryland law. Additionally, the trial court permitted appellant to attack White's credibility through cross examination as to White's civil claim against appellant and Prince George's County as well as his prior convictions for grand larceny, receiving stolen goods, and first degree burglary. In light of these factors, the trial court determined that the prejudicial effect of permitting cross examination outweighed its probative value. We will not disturb the trial court's ruling absent an abuse of discretion, Merzbacher v. State, 346 Md. 391, 405, 697 A.2d 432 (1997) (citing Hunt v. State, 321 Md. 387, 425, 583 A.2d 218 (1990) and 5 L. McLain MARYLAND LAW OF EVIDENCE § 403.1 at 297 (1987 ed.)), and we find none here. See Easter, 66 F.3d at 1022.

III.

Did the Trial Court Err in Permitting the State to Elicit the Hearsay Statement that Appellant Was "Looking for a Fight," as a Present Sense Impression?
Prior to White's taking the stand, the State requested that the trial court rule whether a statement made by Brandon Clark to White to the effect that appellant was "looking for a fight" was admissible under Maryland Rule 5-803(b)(1)[10] as a statement of Clark's present sense impression. The following ensued:
[THE STATE]: Robert White, I'm proffering this, is going to testify that, when he was in the Marlo truck out in front of [appellant's] home, Brandon Clark went to the door, met with [appellant], and Clark was able to seeor White was able to see that. And then he came back, Clark came back to the truck and said something to the effect of ["]man, this guy is looking for a fight.["]
Our positionof course, Brandon Clark can't be here to testify. He's unavailable. Our position is that it's a present sense impression. It was Brandon Clark's impression of [appellant] immediately after having contact with him, immediately after perceiving him and meeting with him.
[DEFENSE COUNSEL]: Your Honor, we object to it. First of all, there won't be cross-examination of Brandon Clark. *572 So it is a statement that Robert White is allowed to make without any kind of cross-examination.
And there is two relevant layers of hearsay. First of all, what the statement actually is it's an interpretationit comes from Robert White. There's no corroboration of it. But it's an interpretationit's Brandon Clark's interpretation, his opinion about [appellant's] state of mind, and that's not admissible.
They argue it's a present sense impression, but it's really an opinion about an interaction about which we know nothing, and that's not admissible. And then relaying that to Mr. White doesn't make it admissible either.
* * * * * *
THE COURT: I believe ... we have in this particular matter provided by the Maryland Rules 5-803(b)(1), which gives present senses impression as a statement describing or explaining an event or condition, even while the declarant was perceiving the event or condition. This rule seems to be entirely consistent with the case law, and the declarant, without any motivation to falsify, described an event he is observing at that very moment or shortly thereafter.
That appears to be the setting here. The State is proffering that the statement to be made was prior to any shooting that later occurred in the house. I believe that this falls squarely within the confines of Booth versus State,[306 Md. 313, 331, 508 A.2d 976 (1986),] ... as a present sense impression statement made by an unavailable declarant.
* * * * * *
I have weighed the impact of the statement, in terms of the probative value of it, balancing it against the possible prejudicial impact that it may have on the jury, and I find that the probative value far outweighs the prejudicial impact of this.
* * * * * *
THE COURT: [Y]ou're entitled, certainly, to cross-examine [White] about when that statement was made to him and all of the circumstances surrounding it, but I believe this is a classic present sense impression.
[DEFENSE COUNSEL]: And would we be also entitled to cross-examine him about the manner in which and the timing about when he brought that statement to light?
THE COURT: Well, that's certainly within your purview.
(Emphasis added.)
The jury returned to the courtroom and White took the stand and testified:
[THE STATE]: Robert, on January 24th, do you remember, approximately, the time it was that you arrived to do the last delivery?
[THE WITNESS]: I'm not sure what time it was. It was late.
[THE STATE]: Who was driving the truck?
[THE WITNESS]: Brandon [Clark] was.
[THE STATE]: What happened when you arrived at Shellford Lane?
[THE WITNESS]: Well, before we got to that lane, we actually called the customer to see if he was home, because it was getting dark or dark, and we asked him could he either come outside or turn a light on; we wasn't far away from his house. When we arrived, the customer was standing outside. Brandon gets out of the truck, goes to talk to the customer comes back and says

*573 [DEFENSE COUNSEL]: Your Honor, I object to the narrative here.
[THE COURT]: I believe the witness can explain it as he wishes.
[THE STATE]: Continue as to when Brandon got out of the truck.
[THE WITNESS]: Brandon gets out of the truck, goes up to talk to the customer, comes back and said, "The guy's looking for a fight." I said, "Brandon, let's go. Well, let's just leave." He said we couldn't do that; we have to call our supervisor.
(Emphasis added.)
Appellant did not object to White's response nor did he move to strike it. While appellant cross-examined White extensively, he did not ask him any questions regarding the circumstances surrounding Clark's statement.
On appeal, appellant contends that the statement was impermissible hearsay. In response, the State argues that the issue was not preserved for appellate review because appellant's trial counsel failed to object to the substance of White's response when White testified as to the hearsay statement. Alternatively, the State contends that White's testimony was admissible as a "present sense impression" pursuant to Maryland Rule 5-803(b)(1). We conclude that, although the question is a close one, appellant preserved the issue for appellate review. However, the trial court did not err in admitting the controverted testimony. We will address each issue separately.

A.
The issue here is whether appellant's trial counsel's statement "Your Honor, I object to the narrative here," coupled with his opposition to the State's in limine motion, was sufficient to preserve the issue of the admissibility of White's testimony regarding Clark's statement for appellate review.
As a general rule, when a court rules in an in limine proceeding that evidence is admissible, Rule 4-323(a) requires that the party opposed to admission object at the time the evidence is actually offered in order to preserve the issue for appellant review. Reed v. State, 353 Md. 628, 639-40, 728 A.2d 195 (1999); Prout v. State, 311 Md. 348, 356-57, 535 A.2d 445 (1988) (interpreting predecessor rule). The Court of Appeals recognized an exception to the general rule in Watson v. State, 311 Md. 370, 535 A.2d 455 (1988).
In Watson, the defendant filed a motion in limine requesting the court to determine whether his prior convictions for attempted rape and theft were admissible to impeach his credibility in the event he testified. The court ruled that both convictions were admissible. Id. at 371-72, 535 A.2d 455. After the defendant completed his testimony on direct examination, the State informed the court that it intended to cross-examine the defendant on both convictions. The court reiterated its ruling that evidence of the attempted rape conviction was admissible and the defendant did not object to the State's questions on the subject. Id. at 372, 535 A.2d 455. The Court of Appeals held that the issue was preserved for review:
In the case sub judice, the trial judge ruled prior to trial on the motion in limine to admit Watson's prior convictions. Thus, standing alone, Watson's objection to the trial court's pretrial ruling would be insufficient to preserve his objection for our review. However, the trial judge reiterated his ruling immediately prior to the State's cross-examination of Watson. It was during this cross-examination that the State elicited Watson's prior convictions. As we see it, requiring Watson to make yet another *574 objection only a short time after the court's ruling to admit the evidence would be to exalt form over substance.
Id. 311 Md. at 372, n. 1, 535 A.2d 455.
The Watson exception is a narrow one. Reed, 353 Md. at 636 n. 4, 728 A.2d 195 ("Watson was limited to its specific circumstances...."); see also Clemons v. State, 392 Md. 339, 362-63, 896 A.2d 1059 (2006) (issue of admissibility of scientific evidence preserved for appellate review pursuant to Watson when counsel stated grounds prior to voir dire examination of expert witness but did not restate them after examination was concluded).
The facts in the instant appeal are not fully analogous to Watson. In the case at bar, the trial court's ruling came before, not during, White's testimony and the trial court did not reiterate its ruling. However, appellant's counsel did object. Although counsel's objection did not expressly refer to the grounds asserted in the in limine hearing, that hearing had concluded only minutes before. The phrase "the narrative here" can be interpreted to refer to the substance, as well as the style, of White's testimony. In light of the close temporal proximity between the trial court's ruling on the motion in limine and White's testimony, we will resolve the ambiguity in favor of the appellant and consider the issue preserved for review.

B.
Appellant presents us with alternative grounds to conclude that the trial court erred.
Appellant's first contention is that an unknown amount of time elapsed between Clark's conversation with appellant and Clark's statement to White that appellant was "looking for a fight." In light of this, appellant argues that the trial court erred in determining that Clark's statement to White reflected a present sense impression:
Based on the record in this case, enough time elapsed for Clark to walk an unknown distance[11] from the house to the van to speak with White. During that time, any number of things (that we can never know) may have crossed the declarant's mind, causing him to mislead his companion.
Appellant did not present the issue of lapse of time to the trial court. Since appellant raised specific contentions as to why the testimony was inadmissible, which did not include the issue of a possible lapse in time with the trial court, he is foreclosed from raising that issue for the first time on appeal. Lee v. State, 186 Md.App. 631, 669, 975 A.2d 240 (2009); State v. Jones, 138 Md.App. 178, 218, 771 A.2d 407 (2001) ("[W]hen particular grounds for an objection are volunteered or requested by the court, `that party will be limited on appeal to a review of those grounds and will be deemed to have waived any ground not stated.)'" (quoting Leuschner v. State, 41 Md.App. 423, 436, 397 A.2d 622, cert. denied, 444 U.S. 933, 100 S.Ct. 279, 62 L.Ed.2d 192 (1979)); Jeffries v. State, 113 Md.App. 322, 341, 688 A.2d 16, cert. denied, 345 Md. 457, 693 A.2d 355 (1997) ("`[W]hen the grounds for an objection are stated by the objecting party, either on a volunteered basis or at the request of the court, only those specifically stated are *575 preserved for appellate review; those not stated are deemed waived.'") (quoting Banks v. State, 84 Md.App. 582, 588, 581 A.2d 439 (1990)).
Appellant also contends that Clark's statement reflected not a present sense impression but rather an opinion as to appellant's state of mind:
Most significant to the analysis of the putative "present sense impression" in this case is the nature of Clark's statement. His statement was an opinion of [appellant's] state of mind. Moreover, although the words "he is looking for a fight" suggest that Clark personally observed [appellant's] demeanor, it is impossible to verify on what basis Clark made his speculative opinion of [appellant's] state of mind.
The leading case in Maryland on the present sense impression exception to the hearsay rule is Booth v. State, 306 Md. 313, 508 A.2d 976 (1986). In Booth, the Court of Appeals surveyed previous Maryland cases, scholarly works and authority from other jurisdictions, id. at 317-23, 508 A.2d 976, and concluded:
As observed by the Advisory Committee to the Federal Rules, the "excited utterance" and "present sense impression" exceptions "overlap, though based on somewhat different theories." Advisory Committee Note, Fed.R.Evid. 803(1). The underlying rationale of the two exceptions are similar, i.e., both preserve the benefit of spontaneity in the narrow span of time before a declarant has an opportunity to reflect and fabricate. We conclude that the "present sense impression" exception to the hearsay rule rests upon a firm foundation of trustworthiness, and we adopt it in the form in which it appears at Fed.R.Evid. 803(1).[12]
Id. 306 Md. at 324, 508 A.2d 976.
The Court proceeded "to a consideration of practical problems that may be encountered in the application of this exception." Id. The Court of Appeals identified three such problems:
Initially, we consider the question of requisite spontaneity. Although statements offered under this exception will usually be those made at the time an event is being perceived, we recognize that precise contemporaneity is not always possible, and at times there may be a slight delay in converting observations into speech. However, because the presumed reliability of a statement of present sense impression flows from the fact of spontaneity, the time interval between observation and utterance must be very short. The appropriate inquiry is whether, considering the surrounding circumstances, sufficient time elapsed to have permitted reflective thought. See McCORMICK ON EVIDENCE § 298, at 862 (3d ed. E. Cleary 1984). In the words of Professor Jon Waltz, "absent some special corroborative circumstance, there should be no delay beyond an acceptable hiatus between perception and the cerebellum's construction of an uncalculated verbal description." Waltz, THE PRESENT SENSE IMPRESSION EXCEPTION TO THE RULE AGAINST HEARSAY: ORIGINS AND ATTRIBUTES, 66 Iowa L.Rev. 869, 880 (1981).
306 Md. at 324, 508 A.2d 976.
As we previously noted, the appellant failed to raise the issue of "requisite spontaneity" with the trial court. Moreover, as noted in footnote 11 of this opinion, a photograph of the exterior of the Washington residence taken on the night of the *576 shootings shows the delivery van parked a short distance from the front door to the home. White testified that, when they arrived, "Brandon gets out of the truck, goes up to talk to the customer, comes back and said," "The guy's looking for a fight." The journey back to the truck could not have taken more than a few seconds and there is nothing in White's testimony to suggest that Clark paused to reflect. While the sequence of events lacked the speed of the neurological process suggested by Professor Waltz, there was a "special corroborative circumstance" in this case; namely, White's own testimony as to appellant's state of mind, which was received shortly thereafter without objection:
[THE WITNESS]: When we went inside, he direct [sic] us to a bedroom upstairs. I was walking first, in front of Brandon. Brandon was walking behind me. He was behind Brandon, and he directed us to a bedroom upstairs. We went in, we set the rails down, and then Mr. Washington started arguing with Brandon.
[THE STATE]: And what was Mr. Washington arguing with Brandon about?
[THE WITNESS]: Because, I guess, we got to his house late, and he was upset because he was waiting to his house all day.[13]
The second issue identified in Booth was "the extent to which there must be proof that the declarant is speaking from personal knowledge before the statement may be admitted." Id. at 324, 508 A.2d 976. White's testimony established that Clark had direct knowledge.
The final problem identified in Booth concerned the manner in which the sense impression is conveyed:
An additional problem often encountered in the consideration of this exception to the hearsay rule is the tendency of a spontaneous declarant to characterize that which is being observed in language that involves, or often appears to involve, the opinion of the speaker. As we noted in Ellsworth v. Sherne Lingerie, Inc., 303 Md. 581, 609, 495 A.2d 348 (1985), the line between "fact" and "opinion" is often difficult to draw. A statement that at first blush appears to represent the opinion of the speaker may prove upon more careful analysis to be non-judgmental in character, or it may represent a shorthand rendition of facts. Additionally, we recognize that evidence which enjoys a significant presumption of reliability, and which may be of significant assistance to the trier of fact in arriving at the truth of the matter may be lost if it is excluded because perceptions are cast in opinion form.
Id. 306 Md. at 325, 508 A.2d 976.
In the instant case, White testified that appellant "was looking for a fight." In Booth, the Court quoted with approval Professor Waltz's comment that:
If the out-of-court declaration is not the sort of conscious deduction which the conditions attaching to the present sense impression exception would themselves prohibit, it should be receivable as a shorthand fact description.
Id. 306 Md. at 327, 508 A.2d 976.
We view the phrase "the guy's looking for a fight," uttered a few moments after *577 the conclusion of a conversation, as being a "shorthand fact description" of appellant's demeanor. The trial court did not err in admitting the statement.[14]

IV.

Did the Trial Court Err in Failing to Declare a Mistrial When a State's Witness Testified That Appellant Was "Hostile" on the Telephone After The Witness Had Been Specifically Instructed Not to Make the Statement?
Michael Robinson, Clark's and White's work supervisor, testified at trial as a witness for the State. During an in camera hearing to determine the admissibility of potentially hearsay statements that Robinson was expected to make, the following colloquy ensued:
[THE STATE]: But you spoke with Mr. Clark when you called him on the phone?
ROBINSON: Yes, sir, I spoke with Brandon.
[THE STATE]: Now, with the information you received from Marlo Dispatch Service, what did you say to Brandon?
ROBINSON: I told Brandon that you can go ahead and make the delivery now; you know, the liability won't fall back on us; we go ahead and just make the delivery.
[THE STATE]: What did Mr. Clark say to you in response to that?
ROBINSON: He was glad. He said he was like good. He said because this is all messed up, you know; it's taking too long; ten minutes for just a set of bed rails.
[THE STATE]: Did he explain any further as to why the situation was messed up?
ROBINSON: No. Basically, he was just stating that, you know, a set of bed rail hookup only takes ten minutes, and they had been there already for over 15 to 20 minutes.
Appellant objected to Robinson's testimony that Clark was "glad." The trial court stated:
[Robinson] is not going to be entitled to give his impression or opinion that Mr. Clark was glad, period. I mean he is to *578 give no opinion as to what he heard about the context of the mental state of the defendant.
Appellant withdrew his objection. The trial court then told the prosecutor to instruct the witness "that he cannot provide his opinion or give his impression that Mr. Clark was glad, angry, happy, upset, anything."
Before the jury, Robinson testified that he spoke to Clark "about three times" while Clark was at appellant's residence. The first conversation was initiated by Clark, who called to inform him that "the paperwork [was] not adding up" because the work order from Marlo required him to pick up defective bed rails but there were no rails at appellant's house. Robinson testified that he told Clark that he would call him back. The following testimony ensued:
[THE STATE]: Did you call Mr. Clark back?
[ROBINSON]: Yes, sir.
[THE STATE]: What did you inform Mr. Clark?
[ROBINSON]: I informed Mr. Clark that ... we can go ahead and make the delivery.
[THE STATE]: Did Mr. Clark say anything to you during this conversation?
[ROBINSON]: Yes, sir.
[THE STATE]: What did Mr. Clark say to you?
[ROBINSON]: He said that the situation was all messed up.
[THE STATE]: Did Mr. Clark further explain why the situation was all messed up?
[ROBINSON]: Yes, sir.
[THE STATE]: What did Mr. Clark say?
[ROBINSON]: Mr. Clark said that it was, you know, that it was taking a long time just for a 15-minute set of bed rails and that, you know, the guy was pretty hostile
[THE STATE]: Well
[DEFENSE]: Objection, Your Honor. Move to strike.
[THE COURT]: Approach the bench, please.
(Counsel approached the bench and the following ensued.)
[THE STATE]: Your Honor, the witness has been instructed numerous times not to make any characterizations as to Mr. Washington or as to Mr. Clark.
[DEFENSE COUNSEL]: Your Honor, at this point I think the defense has to make a motion for a mistrial.
The witnesses [sic] are writing down what the witness said. The reason for the motion and having it outside of the jury was this exact issue and, according to [the prosecutor], the witness was admonished not to make the statement. He made the statement, clearly, and at this point, Your Honor, the jury is unfairly prejudiced by the statement, and there is no limiting instruction the Court can do to cure that problem.
[THE STATE]: A limiting instruction may be able to cure the problem. It was one statement, and I may be able to take care of that problem.
[DEFENSE CO-COUNSEL]: We took every precautionary measure we could think of, Your Honor, to keep this from happening. Every juror has written that statement in their book, from what we can see, in their notes. There is no other option.
But there's also a problem that, with the way the State examined the witness, left it open for him to be able to add this statement at the last part of the other *579 statement that he made. It was the nature of the direct examination as well.
(Emphasis added.)
After additional discussion between the trial court and counsel, the trial court issued the following instruction to the jury:
[THE COURT]: Ladies and gentlemen of the jury, you have heard Mr. Robinson use the term "hostile." I am telling you and instructing you that this witness has absolutely no basis for the impression that he made or to use the term hostile, and that he was ordered by the Court, prior to his testimony, not to use any terms or impressions, period, with regard to this matter, and that I am instructing you that you cannot consider that part of his testimony whatsoever, under any circumstances or any conditions, and you need to strike that from you mind.
If any of you cannot do that, I need you to come to the bench and tell me.
Mr. Foreman, I would like you to pass around a note, please, and ask if there was anyone who could not strike that from their mind.
(The foreman circulated a note to all jurors.)
[THE COURT]: Is there any member of this jury panel who would like to approach the bench on that issue? Thank you.
The record does not indicate that any juror approached the bench.
Appellant argues that Robinson's testimony was so prejudicial that no curative instruction would have been adequate and that the trial court erred in not declaring a mistrial. He points to "the numerous and deliberate steps [that] were taken to prevent Robinson from testifying in regard to appellant's demeanor" as proof of the unfairly prejudicial nature of Robinson's testimony. The State, while conceding that Robinson's testimony was prejudicial, asserts that the curative instruction was adequate and that the trial court did not err in denying the request for a new trial.
In Wilson v. State, 148 Md. App. 601, 666, 814 A.2d 1 (2002), cert. denied 374 Md. 84, 821 A.2d 371 (2003), we explained that the decision to declare a mistrial:
"is committed to the sound discretion of the trial court. Ordinarily, the exercise of that discretion will not be disturbed upon appeal absent a showing of prejudice to the accused. In order to warrant a mistrial, the prejudice to the accused must be real and substantial; a mistrial should never be declared for light or transitory reasons."
(quoting Chambers v. State, 81 Md. App. 210, 217, 567 A.2d 458 (1989)) (citations omitted in Wilson); accord Carter v. State, 366 Md. 574, 785 A.2d 348 (2001); Klauenberg v. State, 355 Md. 528, 735 A.2d 1061 (1999); Rainville v. State, 328 Md. 398, 614 A.2d 949 (1992); Hunt v. State, 321 Md. 387, 583 A.2d 218 (1990)). Wilson further explained:
The trial judge is in the best position to decide whether the motion for a mistrial should be granted. Accordingly, we will not interfere with the trial judge's decision unless appellant can show that there has been real and substantial prejudice to his case.
Wilson, 148 Md.App. at 666, 814 A.2d 1 (citing Carter, 366 Md. at 589, 785 A.2d 348 (in turn citing Rainville, 328 Md. at 408, 614 A.2d 949)).
Robinson's testimony was a "blurt" or a "blurt out"an abrupt and inadvertent nonresponsive statement made by a witness during his or her testimony. See State v. Hawkins, 326 Md. 270, 277, 604 A.2d 489 (1992). There is a well established analytical framework for determining *580 whether the prejudice to a defendant resulting from a "blurt-out" is "real and substantial enough" to warrant a mistrial. In Rainville v. State, 328 Md. 398, 408, 614 A.2d 949 (1992), the Court of Appeals explained:
In Guesfeird [v. State, 300 Md. 653, 659, 480 A.2d 800 (1984)], the Court set forth the following factors to be considered in determining whether a mistrial is required:
whether the reference to [the inadmissible evidence] was repeated or whether it was a single, isolated statement; whether the reference was solicited by counsel, or was an inadvertent and unresponsive statement; whether the witness making the reference is the principal witness upon whom the entire prosecution depends; whether credibility is a crucial issue; [and] whether a great deal of other evidence exists....
Id. 300 Md. at 659, 480 A.2d 800. In Kosmas [v. State, 316 Md. 587, 560 A.2d 1137 (1989)], we made it clear that "these factors are not exclusive and do not themselves comprise the test." 316 Md. at 594, 560 A.2d 1137.
Every trial is different and the test articulated in Guesfeird is open-ended and fact-specific. We think it useful to consider how the test has been applied in a variety of factual contexts.
Guesfeird and Kosmas are, in a sense, mirror images. Guesfeird involved a prosecution for the sexual abuse of a young teenage girl whose uncorroborated testimony was the sole basis for the prosecution. During the course of her direct examination, she testified that she had taken a lie detector test. Guesfeird., 300 Md. at 656, 480 A.2d 800. Defense counsel moved for a mistrial, which was denied. The court then issued a cautionary instruction to the jury to disregard any reference to a lie detector test. Defense counsel objected to the instruction as well "because of the emphasis it had created." Id. at 657, 480 A.2d 800.
Kosmas was another lie detector case. The defendant was accused of murdering his wife. There were no eyewitnesses and no physical evidence tying the defendant directly to the crime. The State's case consisted largely of the uncorroborated testimony of the victim's son, who stated that the defendant had repeatedly physically abused his mother, and the uncorroborated testimony of Mattson, a private detective who testified that the defendant had approached him about murdering the victim for money. The defendant denied murdering the victim, abusing her, and attempting to hire Mattson as a murderer. Kosmas, 316 Md. at 588-91, 560 A.2d 1137. Mattson also testified that the defendant refused to take a polygraph test. Id. at 592, 560 A.2d 1137. As in Guesfeird, the trial court gave a cautionary instruction but denied a motion for a mistrial. Id.
The Court of Appeals reversed both convictions. In Guesfeird, the Court stated that the victim's
uncorroborated testimony conflicted directly with the testimony of the defendant and all the other witnesses. In this case, credibility was the crucial issue for the jury. [The victim], who stated that she had taken a lie detector test, was... the sole prosecution witness whose testimony supported the charges. The unavoidable inference for the jury to make is that if she took the test, she passed and was telling the truth at trial; otherwise, the prosecution would not have gone forward with her as the only witness.
Guesfeird, 300 Md. at 666-67, 480 A.2d 800. In Kosmas, the Court first noted that, as Mattson was a retired Baltimore *581 City police detective, "[i]t seems highly likely that [Mattson] was aware that evidence concerning lie detectors was inadmissible, and it requires a generous nature to assume that his reference to the defendant's refusal to take a lie detector test was inadvertent." 316 Md. at 596, 560 A.2d 1137. The Court continued:
More important, however, are the questions of whether credibility of the defendant was a crucial issue in the case, and whether the strength of the State's case was otherwise such that the prejudice resulting from the improper admission of the evidence may be considered insubstantial. On the first issue, it is clear that the defendant's credibility was critical to the success of his case. Much of the strength of the State's circumstantial evidence case depended upon the jury believing that the defendant had repeatedly threatened and abused his wife, and had attempted to contract for her murder. The defendant adamantly denied the truth of those allegations. Informing the jury that the defendant had refused to take a lie detector test cut to the heart of the defense.
* * * * * *
We turn to the question of the weight of the other evidence against the defendant.... Overall, it is fair to say that if [the victim's son] and Mattson are believed, the State has a strong circumstantial evidence case, but even then it is not overwhelming. If the defendant is believed in those areas in which his testimony conflicts with that of Michael and Mattson, the State's case is very weak. Again, then, it is apparent that the issue of the defendant's credibility is a central and crucial factor in this case, and the State's evidence that does not hinge at least in part upon the determination of that credibility is hardly of sufficient strength to permit us to find beyond a reasonable doubt that the inadmissible evidence did not in any way influence the verdict.
Id. 596-98, 560 A.2d 1137.
In State v. Hawkins, 326 Md. 270, 279, 604 A.2d 489 (1992), the Court considered the effect of two police officers' testimony regarding the defendant's interrogation. One witness testified that the defendant gave inconsistent versions of who committed a murder and, as a result,
I went out of my office into Sergeant Bane's office and told him what had happened. He came back into the polygraph suite(witness slapped hand on witness table)I'm sorrycame back into my office and said, told the Defendant that she was under arrest.
Id. at 274, 604 A.2d 489. The other officer made a passing reference to the defendant's being "in the area next to the polygraph room...." Id. at 275, 604 A.2d 489. The trial court denied a motion for a mistrial. Id. at 276, 604 A.2d 489.
First noting that, in contrast to Kosmas, the blurts were uttered "without nefarious intent," id. at 277, 604 A.2d 489, the Court determined that the trial court did not abuse its discretion in denying the motion for a new trial:
The fundamental rationale in leaving the matter of prejudice vel non to the sound discretion of the trial judge is that the judge is in the best position to evaluate it. The judge is physically on the scene, able to observe matters not usually reflected in a cold record. The judge is able to ascertain the demeanor of the witnesses and to note the reaction of the jurors and counsel to inadmissible matters. That is to say, the judge has his finger on the pulse of the trial.
Supporting the denial of the motion by the judge here was that the references *582 to "polygraph" were not solicited or pursued by the prosecutor. All that the officers voiced, without embellishment, was the taboo word "polygraph". Neither officer stated that Hawkins had taken a polygraph test or had expressed her willingness or unwillingness to take it.
Id. at 278, 604 A.2d 489.
In Rainville, the defendant was charged with sexually molesting a child. In her testimony, the victim's mother inadvertently alluded to the fact that the defendant was in jail "for what he had done" to another child. 328 Md. at 401, 614 A.2d 949. The trial court denied a motion for a new trial and gave a curative instruction. Id. at 402, 614 A.2d 949. The Court viewed the mother's statement as being particularly prejudicial to the defendant because the jury could have inferred from it that the defendant had molested another child. Id. at 407, 614 A.2d 949. In light of the prejudice and several inconsistencies in the State's case and a lack of probative medical evidence, it was "not persuaded that the trial judge's curative instruction could be effective under the circumstances of this case." Id. 410-11, 614 A.2d 949.
In applying the Guesfeird factors to the instant case, Robinson's statement was isolated and we do not find that there is any indication that the prosecutor was intending to solicit Robinson's response. Robinson certainly was not the principal witness in the State's case. The degree of prejudice engendered by Robinson's testimony does not approach that found in Guesfeird, Kosmas, or Rainville. While credibility was a crucial factor in the case, the conflict was between the testimony of White on the one hand and appellant and Mrs. Washington on the other. Robinson's testimony neither enhanced nor detracted from the credibility of any of these witnesses. Unlike Rainville, Robinson did not indicate that appellant was guilty of a crime similar to which he was being tried. As to the strength of the State's case, there was corroborating evidence to support portions of White's testimony. The testimony of appellant and Mrs. Washington that appellant was attacked by White and Clark is inconsistent with evidence as to appellant's lack of injuries. Finally, the trial court took prompt corrective action with the jury.
We bear in mind that the trial court is better equipped than we are to "ascertain the demeanor of the witnesses and to note the reaction of the jurors and counsel to inadmissible matters." Hawkins, 326 Md. at 278, 604 A.2d 489. We conclude that the trial court did not abuse its discretion in denying the motion for a mistrial.

V.

Did the Trial Court Err in Failing to Sustain Appellant's Objection to the State's Allegedly Improper Remarks Made In Its Opening Statement?
As part of its opening statement, the State addressed the fact that White's DNA was found on appellant's handgun. The following ensued:
[THE STATE]: We'll hear DNA testimony.... [Y]ou will hear testimony that the defendant's gun was taken at the scene from him, by police, and they swabbed it for DNA. Of course, they found his DNA on it; they found evidence of Robert White's DNA on it and two other persons.
* * * * * *
But even with that, by the defendant's own account of what happened, he never said anything about anybody trying to grab his gun, hold his gun, have his gun
[DEFENSE COUNSEL]: Objection.

*583 [THE COURT]: Approach the bench.
(Counsel approached the bench and the following ensued.)
[DEFENSE COUNSEL]: Your Honor, [the prosecutor] is using the grand jury testimony.
[THE STATE]: No, I'm not. I'm referring to the 911 recording that we're going to introduce as evidence. I've given them a copy and notified them that we're going to use that.
[DEFENSE COUNSEL]: He needs to specify what it is, because what he's doing now is very dangerous in that he is trying to impeach the defendant, who does not haveit does not require him to testify, and he's already talking about what I believe is grand jury. So he needs to specify exactly what he's talking about.
[THE COURT]: What exactly are you referring to, for purposes of the record?
[THE STATE]: The 911 recording.
* * * * * *
[THE COURT]: And you are not in any way, shape or form or fashion referring to any grand jury testimony?
[THE STATE]: Oh, no.
[DEFENSE COUNSEL]: But he's arguing an omission, Your Honor, that he, I assume, believes should have been on the 911 call.
[THE COURT]: I'm sorry?
[DEFENSE COUNSEL]: He's arguing some kind of omission. What I heard him say was the defendant did not say that someone tried to grab his gun. So he's arguingisn't that what you said?
* * * * * *
[THE COURT]: Your objection is overruled but noted.
[DEFENSE COUNSEL]: Thank you.
(Counsel returned to trial tables and the following ensued.)
[THE STATE]: Repeating myself. The presence of Robert White's DNA on the gun, not knowing how it got there or what kind it was. The defendant himself, during the 911 call to the dispatcherand you'll hear thathe doesn't say anything about that. He just wanted his version known at that time. And, of course, his version is going to be different than what Robert White is going to tell you.
Before this Court, appellant argues:
At the time the State remarked on [appellant's] failure to make a statement to the 911 dispatcher, about whether either victim attempted to grab his gun, the State was unaware of whether [appellant] planned to testify or to invoke his privilege against self-incrimination. Without knowing whether [appellant] would testify, the State essentially promised the jury that it could disprove [appellant's] self-defense claim by proving, through [appellant's] failure to indicate otherwise on the 911 call, that neither victim attempted to grab [appellant's] gun.
* * * * * *
The State is not permitted to comment on what a defendant may or may not testify to in its opening statement... When the State makes such comments, it alludes to evidence that is only admissible as impeachment evidence, if the defendant elects to testify.
(Emphasis in original.)
Appellant relies upon Allen v. State, 318 Md. 166, 567 A.2d 118 (1989), to support his contention that the prosecutor could not have believed, in good faith, that he would have been able to put on evidence demonstrating that appellant "never said *584 anything about anybody trying to grab his gun, hold his gun, have his gun."
In Allen, the Court of Appeals reversed a trial court's ruling allowing the prosecutor, in his opening statement, to say that the jury would hear from a witness about the witness' relationship with the defendant when the prosecutor and the trial court both knew that the witness would be invoking his right against self-incrimination. Id. at 179, 567 A.2d 118. Allen is inapposite to the facts presented by this appeal.
In the case sub judice, the prosecutor in good faith expected to, and ultimately did, introduce the 911 recording during which appellant makes no mention of anyone trying to grab the handgun from him. The trial court did not err in overruling appellant's objection.

VI.

Did the Trial Court Err in Failing to Declare a Mistrial Based Upon the State's Allegedly Improper Remarks Made In Its Closing Argument?
Appellant asserts that the State repeatedly made improper and prejudicial statements in its closing argument. Appellant argues the statements either addressed facts not in evidence or generated unfair prejudice against him. In his brief, appellant points to twelve separate portions of the State's closing that he contends were improper. He contends that the trial court erred in not granting his motion for a mistrial based upon the cumulative effect of these statements.
In response, the State contends that the statements at issue, even taken cumulatively, were not prejudicial enough to warrant a new trial. In addition, the State argues that appellant failed to raise several of the controverted statements when it presented its motion for a mistrial and has not preserved his right to raise them on appeal.
We do not find the State's argument regarding preservation to be persuasive in this context. While the State is correct that appellant did not specifically mention each allegedly improper statement when he made his motion, appellant made it clear that his motion was based upon the cumulative impact of the statements. Therefore, we consider the appellant's contentions preserved for our review.
We begin by noting that "`[t]here is no doubt that, in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused.'" Lawson v. State, 389 Md. 570, 589, 886 A.2d 876 (2005 (quoting Dunlop v. United States, 165 U.S. 486, 498, 17 S.Ct. 375, 41 L.Ed. 799 (1897)). Mistrials are required for improper remarks in closing argument only when "the remarks of the prosecutor actually misled the jury or were likely to have misled or influenced the jury to the prejudice of the accused." Lee v. State, 405 Md. 148, 164, 950 A.2d 125 (2008) (quoting Lawson, 389 Md. at 592, 886 A.2d 876).
The determination whether a prosecutor's comments were sufficiently prejudicial to warrant a mistrial lies within the sound discretion of the trial court. Lawson, 389 Md. at 592, 886 A.2d 876 (citing Spain v. State, 386 Md. 145, 158-59, 872 A.2d 25 (2005) and Henry v. State, 324 Md. 204, 231, 596 A.2d 1024 (1991), cert. denied, 503 U.S. 972, 112 S.Ct. 1590, 118 L.Ed.2d 307 (1992)). In Lee, Judge Battaglia explained:
When assessing whether reversible, or its converse, harmless, error occurs when improper statements are made during closing argument, [appellate courts] review various factors, including *585 "the severity of the remarks, the measures taken to cure any potential prejudice, and the weight of the evidence against the accused."
Lee, 405 Md. at 165, 950 A.2d 125 (quoting Lawson, 389 Md. at 592, 886 A.2d 876, and citing Spain, 386 Md. at 159, 872 A.2d 25 and Hill v. State, 355 Md. 206, 223, 734 A.2d 199 (1999)).
Comments made in closing argument must be weighed in their context. Clermont v. State, 348 Md. 419, 455, 704 A.2d 880 (1998); Colvin-el v. State, 332 Md. 144, 178-79, 630 A.2d 725 (1993). Therefore, we now turn to the relevant portions of the State's closing. (When necessary, we will place each excerpt in its context.)
[THE STATE]: Robert White woke up at six. He found out that he was needed to come help do some manual labor. He was out on the corner, ready to work, ready to earn money. He worked all day, hard, back-breaking work. When he laid down on that carpet with the bullets in him, you heard him saying I cannot believe I'm going to leave this place today over some bed rails. This is for Robert.
[DEFENSE CO-COUNSEL]: Objection, Your Honor.
[THE COURT]: Sustained.
[DEFENSE CO-COUNSEL]: Move those comments to be stricken.
[THE COURT]: Stricken.
[THE STATE]: And when he [appellant] sat in his house, mad, at 1:30, over the delivery, angrier at five, angrier at six, fuming by 7:30, when they arrived and when he was still looking for a fight, as Brandon Clark told Mr. White, and when they called Marlo and they said this is messed up, and when he fired the shots into the young men, and he kept shooting until the gun jammed, this is also for him.
[DEFENSE CO-COUNSEL]: Objection.
[THE COURT]: Sustained.
[DEFENSE CO-COUNSEL]: Move to strike.
[THE COURT]: Stricken.
* * * * * *
Brandon kneels down, to start getting the bed ready to put the rails on, when he starts getting hit. He gets pushed.
Brandon is large. He's a furniture delivery guy. He's large, to the point where you remember Mr. White said do you know him or something; what's going on? Brandon wasn't being hurt, by any stretch of the imagination, but it was just odd how he was being pushed, poked, talked to any kind of way, to the point whereand this is where your notes will always control. Your memory will always control. Something was said to the effect of, ["]sir, I think you really need to watch how you talk to people.["] Do you all remember that? What did that comment do to him [appellant]? Set him [appellant] into what he calls an out-of-mind, out-of-body experience.
[DEFENSE CO-COUNSEL]: Objection. Mischaracterization.[15]
[THE COURT]: Overruled.
* * * * * *
When you see a shooting like this, what was Stacey [Mrs. Washington] supposed *586 to do? She saw her husband just kill two furniture deliverymen who had been in the house by her own
[THE STATE]: Objection.
[THE COURT]: Sustained.
[THE STATE]: One deliveryman dead and one who has been damaged for life. I apologize for that.
* * * * * *
Susan Lee, the firearms expert. What I want you to gather from her testimony is this: What she said is one shot means one pull of the trigger. Two shots means what? Two pulls of the trigger.... Five shots, five pulls of the trigger. Six shots, the gun jammed, and she told you at that point he couldn't shoot anymore. And, remember, he told you he don't know if he would have kept shooting or not.
[DEFENSE CO-COUNSEL]: Objection, Your Honor.
[THE COURT]: Sustained.
[DEFENSE CO-COUNSEL]: Move to strike.
[THE COURT]: Stricken.
[THE STATE]: You want to know what the medical testimony that we heard in this case and it'sit is what it is.... Mr. Washington, Keith, the defendant, said I was being beaten; I was beaten in the face; I was hit in the head. He said I was kicked in the face by these two large men
This here shows he said that he was injured but no evidence of trauma. No evidence of trauma. If a 300-pound man and his cousin, who is 280, beat, kicked, punched for 10 or 15 seconds, would you have a bruise?
* * * * * *
Taylor.[16] He testified he took this picture. You saw it already. The one thing I can say about pictures, a picture is a picture. Do you see the fact that he was kicked in the face? Do you see the fact that he was beaten in the face? Beat in the head? Do you see the fact that two 300-pound men jumped on him and beat him mercilessly. To use Mrs. Washington's words, "severely beating him to death."[17] Does this look like this picture was taken before he went to the hospital?
[DEFENSE CO-COUNSEL]: Objection, Your Honor.
[THE COURT]: Sustained.
[DEFENSE CO-COUNSEL]: Move to strike.
[THE COURT]: Stricken as to the wording.
[THE STATE]: Another picture. This picture was taken by Lieutenant Walls, and your notes will always control as to what Lieutenant Walls said. Check your notes. Does this picture, taken a couple hours later, reflect a person who has been beaten, kicked in the face, punched, bruised, hurt, severely beaten, pummeled? These were all the words that were used by Mr. Washington and Mrs. Washington by the two 300-pound men. No, it doesn't.

*587 * * * * * *
You heard from Marilyn Clark .... and she told you she misses her son.
[DEFENSE CO-COUNSEL]: Objection.
[THE COURT]: Sustained.
[THE STATE]: We heard from Robert Rascoe [a Marlo supervisor] who told you that his job is to assist drivers. Mr. Rascoe is interesting because he said he received a call at what time? 1:30 from Mr. Washington asking about his delivery, and he told you that Mr. Washington was cursing on the phone with him at 1:30.... And Mr. Washington hangs up the phone on him, mad
[DEFENSE CO-COUNSEL]: Objection.
[THE STATE]:at 1:30.
[THE COURT]: Overruled.
* * * * * *
Michael Robinson. Michael sat there and remember he started crying at some point. Why? Because he knew he was supposed to be on that truck.... He was supposed to take the bullets, and he is crying to this day and he cried for you.[18]
[DEFENSE CO-COUNSEL]: Objection.
[THE COURT]: Sustained.
[THE STATE]: And he told you
[DEFENSE CO-COUNSEL]: Move to strike.
[THE COURT]: Stricken.
* * * * * *
[State prepared to play 911 recording.]
It is very hard, listening to the sound of someone dying. It's very difficult to listen to the sounds of someone dying.[19]
[DEFENSE CO-COUNSEL]: Objection.
[THE COURT]: Sustained.
[DEFENSE CO-COUNSEL]: Move to strike both references.
[THE COURT]: Strike the second.
[THE STATE]: But the 911 calls how calculating, cold his demeanor was and his manner was. You must listen, though, for omissions to what wasn't said. Your [sic] must also listen for the refusal to answer the questions.
* * * * * *
At this point he [appellant] is ready to blow his top. He comes in. They go up the stairs. He starts hitting them and touching them. They're like what is this dude doing. Sir, you need to watch your mouth. That set him off.
And that's when he had the out-of-mind experience. He grabs his gun. Get out of my house. I got something for you that should get you out of my house. Bam. Bam. Bam, bam. And when White gets up, trying to go for help, didn't I tell you to stay still? Boom.
[DEFENSE CO-COUNSEL]: Objection.
[THE COURT]: Sustained.
[DEFENSE CO-COUNSEL]: Move to strike.
[THE COURT]: As to the action of the hands, stricken.

*588 [THE STATE]: Nothing further.
(Emphasis added.)
After closing arguments were completed, appellant moved for a mistrial:
[DEFENSE COUNSEL]: We think there were a number of things said that were improper, unfairly prejudicial and warrant relief in the form of a mistrial.
The first is repeated statementsor one as to each, Mr. Clark and Mr. White. "This is Robert White's case. "This is Brandon Clark's case." I think that those things are designed to unfairly and unduly arouse sympathy and are prejudicial.
There was a statement made about Mr. Washington sayingand it was saying out-of-mind experience, and the record very clearly shows that he never said that. His exact words were out-of-body experience. He never said out of mind.
[THE COURT]: Okay.
[DEFENSE COUNSEL]: It's prejudicial to characterize him as saying out of mind or out of his mind or the words that were used, and that's not what he said and that's not in the record.
There was also a statement made and a demonstration done about the issue of whether Mr. Washingtonor the argument was made that Mr. Washington would have continued to fire the gun, and [the prosecutor] demonstrated, extended his hand, as though he was pulling a trigger, and said, "click, click," demonstrating Mr. Washington. I believe he was talking about Mr. Washington leaning over Robert White, shooting him.
There is nohe made a reference, and the record will show what he said, about Mr. Washington would have kept firing or said that he would have kept firing, and both the demonstration and what was said mischaracterized the testimony, because there was no evidence of anyfirst of all, there's no testimony that remotely resembles what [the prosecutor] demonstrated, and there was no testimony from Mr. Washington that he would have continued to fire if the gun hadn't jammed or stopped firing or whatever the term is.
There was a statement, that we believe was inconsistent with the record, about pictures of Mr. Washington being taken before he went to the hospital. We don't believe any witness said that.
And there was a statement that we know was not testified to, that Marilyn Clark, quote, she said she missed her son. That was never testified to at testimony. That testimony, that's prejudicial. It falls along the same line as "this is for Robert" and "this is for Brandon" and those statements.
There was an improper statement about Michael Robinson and why he was crying and could have been him and all of these things.
There was a statement, I believe also designed to impact the jury emotionally and inflame, about it's very difficult to hear someone dying. I think that's prejudicial.
* * * * * *
There's another one that we, to be completely candid, are having a little trouble deciphering our own note here. But, Your Honor, based on each one of those things that I've raised and the cumulative impact of all of them, we ask for a mistrial. And I note that this is not our first request for a mistrial in this case, because there was testimony given that the Court ordered not to occur, and we moved for a mistrial at that time, and based on all of this, we move for a mistrial again.

*589 [THE COURT]: Go back to ["]court ordered not to occur.["] What are you referencing?
[DEFENSE COUNSEL]: Oh, I'm talking about when Michael Robinson said something about Mr. Washington being hostile. After we held a hearing outside the presence of the jury, the Court ordered the State to instruct him not to say if, and we go back on the record and, within five minutes, he said it.
[THE COURT]: Well, let me take that one first....
And quite clear on this is I gave a very strong curative instruction, well beyond what may have been actually necessary to cure it, and told the jury that he had absolutely no basis whatsoever for making that comment, and we never knew, because there was no foundation laid, whether he could provide that testimony or not. But I made it a point that they had to strike it from their mind, totally disregard it and couldn't consider it. And I said that in a very strong way.
I believe, with respect to that issue, that instruction was appropriate and corrective.
[DEFENSE COUNSEL]: Your Honor, in all fairness as well, I mean, you polled the jury as well and did the note.
[THE COURT]: Correct. Thank you. As to your issues regarding [the prosecutor] referencing Robert White's case, his hand gesture as to what I believe is you believe to be, in effect, demonstrating the gun being fired and then jamming, there was testimony or there was evidence and testimony relating to a cartridge being in the chamber, which ordinarily doesn't happen unless it's jammed.
But as to his hand gesture, as to him saying Robert White's case, as to his comment about Marilyn Clark missing her son, and as to the comment he made about Michael Robinson crying to this day, I sustained all of your objections, struck those matters from the record.
The jury has been instructed on, in fact, what to do with stricken evidence, and that is to totally disregard it and they can't consider it, and that has taken place. Those were part of the instructions.[20]
As to [the prosecutor]'s mentioning or stating, quoting Mr. Washington saying an out-of-mind or out-of-body experience, and I believe that he switched between the two on a couple of different occasions, there was testimony from Mr. Washington that he had an out-of-body experience. I don't recall him saying "mind," but I don't believe that's of the dimension that you're making it out to be, and that was part of the testimony.
The pictures you're making reference to, and I believe that's the picture of Mr. Washington that you indicated that there was no testimony about the picture being taken before he proceeded to the hospital, in point of fact, I don't recall.

*590 [THE STATE]: They were pictures taken of Mr. Washington by the evidence tech Rob Taylor before Mr. Washington went to the hospital.
[THE COURT]: I don't recall that, and I don't believe inflame would be improper argument, if that's part of the record and the testimony.
[DEFENSE COUNSEL]: Our contention is that it was not stated that it was before he went to the hospital, so the record will speak to that.
Before this Court, appellant argues:
Under the three-part test enunciated in Lee, each of the aforementioned prosecutorial remarks was severely prejudicial.
Many of the State's remarks improperly probed the passions and sympathies of the jury....
Several other remarks urged the jury to consider facts not in evidence....
As to the second factor, the weight of the evidence against Mr. Washington, the evidence was not so great as to outweigh the prejudice created by the State's numerous remarks.... The evidence adduced at trial produced a "close call" for the jury, as the only eye witness to the incident, aside from [appellant], was White, whose credibility was questionable.
Finally, as to the third factor, although the trial court took steps to cure the prejudice created by the State's remarks, those steps were insufficient to remedy the harm done to Mr. Washington. During closing argument alone, the trial court sustained nine of [appellant]'s objections, and granted [appellant]'s various motions to strike the comments from the record. The trial court also instructed the jury to disregard evidence stricken from the record.
(Emphasis in original.)
The State asserts, first, that appellant did not include all of the comments that he now identifies as grounds for a mistrial in his motion for mistrial in front of the trial court. Second, the State contends that, as most of appellant's objections were sustained and the comments stricken from the record, appellant was not prejudiced. The State states that the only preserved objection that was overruled was the objection to the comment that appellant experienced "what he calls an out-of-mind, out-of-body experience." The State argues that "[t]he trial court properly ruled that there was testimony by Washington of an `out-of-body experience' and the prosecutor's reference had been misconstrued and was not `of the dimension' that defense counsel was making it out to be." While we do not agree with all aspects of the State's analysis, we conclude that the trial court did not err in denying appellant's motion for mistrial.
In Lee, the Court of Appeals articulated three factors for a review court to consider in determining whether a trial court abused its discretion in denying a motion for a mistrial based upon improper closing argument: the severity of the improper remarks, the measures taken to cure any potential prejudice, and the weight of the evidence against the accused. 405 Md. at 165, 950 A.2d 125.

(A) The Severity of the Improper Remarks.
Turning to the first of the Lee factors, we conclude that the remarks in question did not involve the sort of impropriety that traditionally requires a mistrial. For example, the prosecutor's remarks in the instant case do not involve invocation of the "golden rule," e.g. an argument "in *591 which a litigant asks the jury to place themselves in the shoes of the victim," Lawson v. State, 389 Md. 570, 593 n. 11, 886 A.2d 876 (2005); or a prosecutorial appeal to the jury's own interests, another rhetorical device that warrants a mistrial. Hill v. State, 355 Md. 206, 214-15, 734 A.2d 199 (1999)," Lee, 405 Md. at 161 n. 6, 950 A.2d 125. Nor do the statements below have anything near the prejudicial impact of the prosecutor's call to the jury in Lee to teach the victim not to follow "the laws of the streets" (which were not specified by the prosecutor), a tactic that the Court of Appeals determined "could do nothing other than lead to juror speculation and decision, perhaps, on information outside the evidence. Id. 405 Md. at 174, 950 A.2d 125. The prosecutor did not inform the jury that they were "chosen to send a message to protect the community," a message that was "wholly improper and presumptively prejudicial." Hill 355 Md. at 216, 734 A.2d 199. The prosecutor did not improperly vouch for the credibility of a witness. Spain, 386 Md. at 157, 872 A.2d 25.

(B) The Measures Taken to Cure Any Potential Prejudice.
Turning to the second of the Lee factors, we conclude that the trial court took prompt and effective measures to mitigate the prejudicial impact of the improper remarks. The trial court sustained the appellant's objections and, when asked to, struck the offending statements.

(C) The Strength of the State's Case.
Finally, as to the strength of the State's case, the State adduced evidence that appellant had been waiting for hours for the furniture delivery and that he was angry. The parties do not contest that appellant was carrying a semi-automatic pistol at his waist when Clark and White arrived at his home. There is sharply conflicting testimony between White and appellant and Mrs. Washington as to the events immediately preceding the shootings but appellant's argument that he was the victim of a sudden, unprovoked, and extremely violent attack by Clark and White is inconsistent with the absence of any medical evidence that he had been severely beaten by White and Clark, and forensic evidence that indicated that at least one of the bullets striking Clark had been fired from more than four feet away. Appellant asserts that White's "credibility was questionable," and, certainly, White's credibility was crucial to the State's case. But in the context of a motion for a mistrial, the trial court, not us, had "its finger on the pulse of the trial," Hawkins, 326 Md. at 278, 604 A.2d 489, and was in the better position to evaluate potential prejudice to the appellant. Id.
Bearing these factors in mind, we conclude that the trial court did not abuse its discretion in denying the motion for a mistrial.

VII.

Did the Trial Court Abuse Its Discretion in Denying the Motion for New Trial?
On August 25, 2008, appellant filed a post-trial motion for a new trial pursuant to Maryland Rule 4-331(b).[21] Appellant *592 asserted four grounds in support of his motion:
1. The trial court erred in preventing introduction of evidence of White's prior criminal convictions to show White's violent propensity as relevant to first aggressor status in Mr. Washington's case of self-defense;
2. The trial court erred in permitting White to testify that Clark stated that appellant was "looking for a fight," as a "present sense impression;"[22]
3. The trial court erred in failing to declare a mistrial after a State's witness testified that appellant was "hostile" on the telephone after that witness had been specifically instructed by the court not to make the statement; and
4. The trial court erred in denying the motion for new trial on the allegation that the trial court failed to declare a mistrial based on the State's repeated improper remarks during the trial.
The trial court denied the motion for a new trial without a hearing and without comment.
Before this Court, appellant contends that the trial court erred in denying the motion for a new trial. To support his contentions, appellant refers to the arguments discussed in Parts I through VI of this opinion. We conclude that the trial court did not abuse its discretion in denying the motion for a new trial.
We begin our analysis by noting that trial errors, such as the sort set out in appellant's motion for a new trial, are not generally cognizable under Rule 4-331(b). In Isley v. State, 129 Md.App. 611, 629, 743 A.2d 772 (2000), (overruled on other grounds, Merritt v. State, 367 Md. 17, 24, 785 A.2d 756 (2001)), Judge Moylan traced the history of Rule 4-331(b) and concluded that its function is limited to the correction of a defect in a verdict. In Ramirez v. State, 178 Md.App. 257, 941 A.2d 1141 (2008), cert. denied, 410 Md. 561, 979 A.2d 708 (2009), Judge Hollander explained as to 4-331(b):
"The Motion in Arrest of Judgment has long been recognized in federal criminal practice and is provided for by Criminal *593 Rule of Procedure 34." In United States v. Sisson, 399 U.S. 267, 280-83, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970), the Supreme Court described how the motion is concerned only with matters `on the face of the record' (the pleadings, the form of the verdict) and not with the evidence or the trial proceedings:
An arrest of judgment was the technical term describing the fact of a trial judge refusing to enter judgment on the verdict because of an error appearing on the face of the record that rendered the judgment invalid.... For the purpose of this case the critical requirement is that a judgment can be arrested only on the basis of error appearing on the `face of the record, and not on the basis of proof offered at trial....' This venerable requirement of the common law has been preserved under the Federal Rules of Criminal Procedure, for the courts have uniformly held that in granting a motion in arrest of judgment under Rule 34, a [federal] district court must not look beyond the face of the record.... Therefore, ... a decision based on evidence adduced at trial cannot be one arresting judgment."
178 Md.App. at 280, 941 A.2d 1141 (emphasis supplied by Ramirez) (quoting Isley, 129 Md.App. at 629, 743 A.2d 772, which in turn quoted C. Torcia IV WHARTON'S CRIMINAL PROCEDURE (12th ed., 1976) 160-61.) However, as Judge Moylan explained in Isley, this Court has sometimes considered appeals of trial courts' denials of motions for new trials under Rule 4-331(b) based upon assertions of trial error. Isley, 129 Md.App. at 629, 743 A.2d 772; see Bates v. State, 127 Md.App. 678, 736 A.2d 407 (1999) and Jones v. State, 111 Md.App. 456, 681 A.2d 1190 (1996). We shall do the same.
A motion for a new trial based upon trial errors such as those in question here is granted or denied by the trial court in the exercise of its discretion. As we explained in Jackson v. State, 164 Md.App. 679, 884 A.2d 694 (2005), cert. denied 390 Md. 501, 889 A.2d 418 (2006), a new trial motion, such as the one sub judice, is often:
based on events that happen in the course of the trial; such as, e.g., rulings on admissibility, potential trial error that may or may not be recognized at the time of occurrence, jury instructions, jury behavior, etc. These events are of a type that will ordinarily happen under the direct eye of the trial judge. For that reason, subsection (a) expressly provides that the trial judge may order a new trial "in the interest of justice" for it is he who has his thumb on the pulse of the trial and is in a unique position to assess the significance of such events. In Buck v. Cam's Rugs, 328 Md. 51, 57, 612 A.2d 1294 (1992), Judge McAuliffe stressed that the range of the trial judge's discretion is accordingly at its broadest when it involves "the judge's evaluation" of "the core question of whether justice has been done."

We are obliged to consider the breadth of discretion that is afforded a trial judge in making this type of decision. As we have seen in tracing the history of our treatment of this issue, the emphasis has consistently been upon granting the broadest range of discretion to trial judges whenever the decision has necessarily depended upon the judge's evaluation of the character of the testimony and of the trial when the judge is considering the core question of whether justice has been done.

Jackson, 164 Md.App. at 699-700, 884 A.2d 694 (emphasis supplied by Jackson).
*594 While the motion for new trial was not, strictly speaking, brought under Rule 4-331(a), it encompassed the types of issues described in Jackson. A decision to grant or deny the motion for new trial in the instant case necessarily turned upon the "judge's evaluation of the character of the testimony and of the trial when the judge is considering the core question of whether justice has been done." For the reasons set out in Parts I through VI hereof, we conclude that the trial court did not abuse its discretion in denying the motion for a new trial.
JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT
NOTES
[1] Appeal No. 0663, September Term 2008, is the appeal of the convictions. Appeal No. 02470, September Term 2008, is the appeal of the trial court's denial of appellant's motion for new trial. On April 14, 2009, this Court granted appellant's motion to consolidate the two appeals.
[2] Appellant is 5'9". White is 6'2", and, at the time of the shooting, weighed 280 pounds; Clark was 6'7" and weighed 300 pounds.
[3] Appellant was sentenced as follows:

Involuntary manslaughter  unlawful act (Brandon Clark): 10 years incarceration (Count VII);
First degree assault (Brandon Clark): 25 years incarceration with all but 10 years suspended to run concurrent with Count VII;
Use of a handgun in the commission of a felony or crime of violence (Brandon Clark): 20 years incarceration consecutive to Counts VII & VIII;
First degree assault (Robert White): 25 years incarceration with all but 10 years suspended to run consecutive to Counts VII, VIII & IX; and
Use of a handgun in the commission of a felony or crime of violence (Robert White): 20 years incarceration with all but 5 years suspended to run consecutive to Counts VII, VIII, IX, & XI.
[4] In Hemingway, this Court held that a defense witness testifying to a victim's violent character could refer to specific instances as the basis for his opinion and that, if the State challenged the accuracy of the witnesses' recollection of the events in question, evidence of the convictions could be introduced to corroborate the testimony. This is a proposition fundamentally different from permitting the introduction evidence of prior convictions as the sole proof of character, as appellant now contends the trial court should have done.

In any event, Hemingway was decided before the adoption of Maryland's current Rules of Evidence in 1994. It is at best questionable whether Hemingway is consistent with current Maryland Rule 5-405, pertaining to proof of character. See 5 L. McLain MARYLAND EVIDENCE, § 405.3 at 740 (2001); J. Murphy MARYLAND EVIDENCE LAW HANDBOOK §§ 507(B) and 507(D) (1999). See also Jensen v. State, 355 Md. 692, 706, 736 A.2d 307 (1999) ("Rule 5-608 unquestionably intended to modify Maryland law, in particular, Hemingway v. State ....").
[5] The closest appellant came to arguing that White's prior convictions were relevant to any defense to be asserted at trial was the following passage from his response to the State's motion in limine:

In this case, Mr. White has several powerful motives to have falsified, or at least shaded, his statements to the police and to testify untruthfully at trial. These motivations all involve Mr. White's criminal record. First, Mr. White wants to receive money based on the fact that he was shot. He has already served notice on Prince George's County that he intended to sue based on the shooting incident. Second, since the moment that the police became involved in this case, Mr. White has a powerful motivation to escape criminal prosecution for the crimes he committed against Mr. Washington inside of Mr. Washington's home...."
In order to avoid prosecution and ultimately obtain money, Mr. White has needed, and continues to need, the police, the State, and ultimately the jury to believe that he was the victim in this incident and not the initial aggressor. Mr. White's criminal record, specifically the number of convictions, the nature of the charges and his sex offender status, [is] the most significant obstacle[] that he Mr. White [sic] must overcome to have his story believed.
This statement falls well short of an assertion that appellant sought admission of White's convictions in order to prove that White was the first aggressor.
[6] Maryland Rule 5-609(a) reads:

Generally. For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during examination of the witness, but only if (1) the crime was an infamous crime or other crime relevant to the witness's credibility and (2) the court determines that the probative value of admitting this evidence outweighs the danger of unfair prejudice to the witness or the objecting party.
[7] The State also contends that the trial court never ruled on appellant's argument that White's failure to register was deceptive conduct probative of his veracity and that, "by not pursuing this issue with the trial court, [appellant] failed to preserve it for appellate review." Our review of the record leads us to a different conclusion.

As we discussed above, appellant's motion in limine advanced four grounds supporting his assertion that he should be permitted to cross-examine White as to his sex offender status. One of those grounds was that White's failure to register was a prior act that is probative of untruthfulness, pursuant to Md. Rule 5-608(b).
On February 8th, the trial court issued a memorandum opinion and order denying the motion in part and reserving a ruling on one ground, namely, appellant's argument that White's sex offender status was probative as to a possible bias in light of White's pending civil action, until testimony could be taken at trial. The trial court's memorandum opinion and order did not explicitly address whether failure to register as a sex offender was a prior act probative of untruthfulness.
On February 12, 2008, the court conducted a hearing on that portion of the appellant's motion which it had reserved. The trial court found that White had no expectation of leniency in return for his testimony and that, accordingly, it would not permit cross-examination regarding his failure to register as a sex offender. The court concluded:
And this, my compliments to you on your legal acumen and your four pronged attack on the purpose of the sexual registration, but I feel that it falls short in this instance and am going to deny your motion and not permit that cross examination in this aspect in front of a jury.
(Emphasis added.)
We interpret the phrase "four-pronged attack" to be a reference to all four grounds presented by appellant in his motion. We conclude that the issue has been preserved for appellate review.
[8] In pertinent part, Fed.R.Evid. 609 provides:

(a) General rule. For the purpose of attacking the character for truthfulness of a witness,
(1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and
(2) evidence that any witness has been convicted of a crime shall be admitted regardless of the punishment, if it readily can be determined that establishing the elements of the crime required proof or admission of an act of dishonesty or false statement by the witness.
(b) Time limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.
[9] Appellant cites Walter v. State, 209 S.W.3d 722, 733 (Tex.App.Texarkana 2006), reversed and remanded, 267 S.W.3d 883 (Tex.Crim. App.2008), for the proposition that Texas permits admission of convictions for failure to register for impeachment purposes. We do not interpret Walter as standing for that proposition.
[10] Rule 5-803 reads in pertinent part:

Rule 5-803. Hearsay exceptions: Unavailability of declarant not required.
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
* * * * * *
(b) Other exceptions
(1) Present sense impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.
[11] The record is not the tabula rasa suggested by appellant. Prior to the trial court's ruling, the State had introduced State's Exhibit No. 3, a photograph of the exterior of appellant's house taken the night of the shootings. The photograph showed a Marlo delivery van parked at the curb in front of appellant's home. In addition, the trial court invited appellant's counsel to cross-examine White as to "all of the circumstances surrounding" Clark's statement; but appellant's trial counsel did not do so.
[12] Fed.R.Evid. 803(1) is identical to Maryland Rule 5-803(b)(1).
[13] White testified regarding appellant's state of mind after he recounted Clark's statement. Thus, the introduction of the hearsay statement and the introduction of the corroborating evidence were out of sequence. However, appellant did not explicitly object to White's testimony on the basis of a lapse in time between Clark's conversation with appellant and Clark's statement to White. Had appellant done so, the State presumably would have established the foundation prior to introduction of the hearsay statement.
[14] Appellant additionally asserts that the introduction of Clark's statement "violated [appellant's] constitutional rights to confront his accusers under the Confrontation Clause of the Sixth Amendment" and Article 21 of the Maryland Declaration of Rights, which is read in pari materia with the Confrontation Clause. Marquardt v. State, 164 Md.App. 95, 120, 882 A.2d 900 (2005). Appellant is incorrect. Appellant's Sixth Amendment Confrontation Clause rights would be implicated by the introduction of "testimonial hearsay." Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). While there are multiple standards to determine what is "testimonial hearsay," "the uniting theme underlying the Crawford holding is that when a statement is made in the course of a criminal investigation initiated by the government, the Confrontation Clause forbids its introduction unless the defendant has had the opportunity to cross-examine the declarant." State v. Snowden, 385 Md. 64, 81, 867 A.2d 314 (2005). Clark's statement to a fellow employee before either had the slightest intimation that anything was seriously amiss was obviously not testimonial.

Finally, appellant claims that his trial counsel's failure to preserve the issue of the admissibility of Clark's statement deprived appellant of effective assistance of counsel. For the reasons set out in Part I(B) of this Opinion, we decline to consider this contention on direct appeal.
[15] On direct examination, appellant testified that he called 911 after the shooting because "I wanted some help down there. I wanted to get the police down there.... I wanted to get as many people down there as I could because it was just an out-of-body experience."
[16] Corporal Robert Taylor, assigned to the Forensic Services Evidence Division, Prince George's County Police, photographed appellant on the night of the shootings prior to the time appellant was transported to a hospital.
[17] Mrs. Washington had testified: "I looked up and then I could see them, him in the middle, and he was kind of bent over, and then there was one man on either side of him, and they were beating him. And I thought oh, my god, oh, my god, they're just going to beat him to death...."
[18] The record does not reflect that Robinson, Clark and White's supervisor, cried while testifying in front of the jury.
[19] A recording of the 911 call from appellant and Mrs. Washington was played to the jury as part of the State's case. Moans and other indications of physical distress are audible in the background.
[20] The trial court had previously instructed the jury:

Inadmissible or stricken evidence must not be considered by you.... If ... I ruled that an answer should be stricken, you must disregard both the question and the answer in your deliberations.
* * * * * *
Opening statements and closing arguments of the lawyers are not evidence in this case. They are intended only to help you to understand the evidence and to apply the law. Therefore, if your memory of the evidence differs from anything the lawyers or I say, you must rely on your own memory of the evidence.
[21] Rule 4-331 provides in pertinent part:

Motions for new trial.
(a) Within ten days of verdict. On motion of the defendant filed within ten days after a verdict, the court, in the interest of justice, may order a new trial.
(b) Revisory power. The court has revisory power and control over the judgment to set aside an unjust or improper verdict and grant a new trial:
* * * * * *
(2) in the circuit courts, on motion filed within 90 days after its imposition of sentence. Thereafter, the court has revisory power and control over the judgment in case of fraud, mistake, or irregularity.
(c) Newly discovered evidence. The court may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule:
(1) on motion filed within one year after the date the court imposed sentence or the date it received a mandate issued by the Court of Appeals or the Court of Special Appeals, whichever is later.
* * * * * *
(e) Disposition. The court may hold a hearing on any motion filed under this Rule.... The court may revise a judgment or set aside a verdict prior to entry of a judgment only on the record in open court. The court shall state its reasons for setting aside a judgment or verdict and granting a new trial.
[22] The first two grounds of the motion for a new trial raised alleged errors that were not preserved at trial. Raising trial errors for the first time in a motion for a new trial is not a substitute for preservation. Torres v. State, 95 Md.App. 126, 134, 619 A.2d 566 (1993) ("A post-trial motion cannot be permitted to serve as a device by which a defendant may avoid the sanction for nonpreservation.")